710 So.2d 1065 (1998)
STATE of Louisiana
v.
Shareef COUSIN.
No. 96-KA-2973.
Supreme Court of Louisiana.
April 14, 1998.
*1066 Clive Adrian Stafford Smith, Lane R. Trippe, Willard W. Hill, Jr., Kern A. Reese, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Joseph E. Lucore, Valentin Solino, New Orleans, for Respondent.
LEMMON, Justice.[*]
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The guilt phase of the case turned on the identification of defendant as the murderer. The principal issues on appeal are (1) whether the trial court properly admitted evidence of defendant's statements to a prosecution witness, supposedly offered to impeach the witness' testimony at trial that defendant did not make any inculpatory statement about the murder; (2) whether defendant was denied the right to a fair trial by the prosecutor's use of the socalled impeachment evidence as substantive proof of the crime through additional questioning of the witness as to the inculpatory and prejudicial details and through argument to the jury stressing the substantive value of the evidence; and (3) whether the prosecutor's failure to disclose clearly exculpatory evidence bearing on identification, as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), requires reversal of the conviction.
Facts
On March 2, 1995, the victim, Michael Gerardi, took Connie Babin out on their first date to the Port of Call Restaurant in the French Quarter of New Orleans. After dinner, the two left the restaurant to return to Gerardi's vehicle parked around the corner. As they were walking, Babin noticed three black teenage males walking toward Gerardi's parked vehicle.
When Babin reached the vehicle, she saw one of the teenagers, later identified as defendant, approaching Gerardi, who yelled at her to run. Babin began running back towards the restaurant, but turned around to see the teenager shoot Gerardi in the face while the other two teenagers were standing on the sidewalk looking at her.[1] She stared at the gunman for a brief moment and then ran into the restaurant.
Although Gerardi received assistance and medical attention immediately, he died from the gunshot wound.
When questioned on the night of the murder, Babin told the police that she did not get a good look at the gunman and probably would not be able to identify him. Babin further stated, in an interview at her house three days later, that she was not wearing her glasses or contact lenses on the night of the murder and could only see patterns and shapes.[2] She described the murderer only *1067 as a black male in his late teens, five feet seven or eight inches tall, with curly hair and "old man's face," and wearing colorful socks. Three weeks later, however, Babin positively identified defendant as the gunman from a photographic lineup. At trial, she repeated the positive identification.
Other witnesses saw the three teenagers. A restaurant cook observed the teenagers loitering in the median in front of the restaurant. Having a strange feeling about the men, he watched them walk up the street alongside the restaurant, but lost sight of them. Approximately twenty to thirty seconds later, he heard a shot and saw Babin running back toward the restaurant.
About the same time, a tour guide conducting a French Quarter walking tour about a block from the restaurant heard a gunshot and saw three black males running away from the area of the restaurant. The three left the scene in a large American car. According to the tour guide, the group had passed the same three persons as the teenagers stood on the street corner near the restaurant approximately fifteen minutes before the shooting. Two other members of the group also noticed the same three males on the street corner at the earlier time. The cook and a member of the tour tentatively identified defendant as one of the three males from a photographic lineup three weeks after the murder.
At trial, the case for the prosecution consisted primarily of the positive photographic identification of defendant by Babin, as well as the two tentative photographic identifications by the cook and a member of the tour. No physical evidence was presented.
The prosecutor also attempted to elicit testimony from James Rowell, defendant's sixteen-year old friend, whom defendant allegedly had told that he (defendant) had robbed and killed a man in the French Quarter. Upon being called as a witness at trial, however, Rowell denied that defendant ever made such a statement. As discussed more fully later, the prosecutor was allowed to present, as so-called impeaching evidence, the testimony of Rowell's attorney and one of the investigating officers describing many details of the crime that Rowell allegedly told them defendant had related to him (Rowell).
The prosecutor also introduced evidence that defendant at his arrest pointed out to officers an error in the arrest warrant as to the date of the crime. There was no other evidence linking defendant to the murder.
The defense, in claiming alibi and misidentification, presented evidence that defendant, at the time of the murder (approximately 10:26 p.m.), was playing in a recreation department basketball game. Two recreation department supervisors, defendant's coach and an opposing team player testified that the basketball game on the night in question had started late and ended late, and the coach testified that he dropped defendant off at his home at approximately 10:45 p.m. that night.
The defense also presented a videotape of the game. The prosecutor, however, timed the periods of the game and used that timing to impeach the alibi witnesses, who had testified that the game periods had run about eight minutes that night. In addition, the prosecutor also impeached the alibi witnesses with prior statements in which they had asserted that the game ended earlier than the time indicated in their testimony at trial.
The jury, apparently rejecting the alibi defenses, found defendant guilty of first degree murder.
After the penalty phase, the jury unanimously recommended the death penalty, finding as an aggravating circumstance that the killing occurred during the attempted perpetration of an armed robbery.
Admissibility of the "Impeachment" Evidence
During opening arguments, the prosecutor claimed that James Rowell, defendant's friend, had informed police in August 1995 of a conversation that he had had with defendant on March 4, 1995, wherein defendant *1068 admitted to killing a man in the French Quarter during an unsuccessful armed robbery. However, when Rowell was called to testify, he denied that defendant had made any such statement to him. While not expressly denying he had told the police that defendant had made such a statement, Rowell asserted that he had only told police at that August 1995 meeting what his lawyer and the police told him to say in order to receive favorable treatment on pending charges. At no time during the examination of Rowell were any details of the recanted statement revealed.[3]
Supposedly for the purpose of impeaching Rowell, the prosecutor called as witnesses the attorney who had represented Rowell on the pending charges and a police detective who was present at a meeting with Rowell and his attorney.[4] Rowell's attorney testified that he had advised his client, who faced nine counts of armed robbery, that he (Rowell) might receive a lesser sentence if he were to come forward with information about other crimes that might be of interest to the district attorney. When asked what information the attorney had told the prosecutor Rowell would reveal, defense counsel objected. After a bench conference, the attorney was asked what information he gave the prosecutor. Over a defense objection, the attorney stated that Rowell had information about defendant's "involvement in this case that's being tried here today." When asked by the prosecutor about the content of Rowell's statement to him regarding this case, the attorney, over defense objection, testified as follows:
A. He said that [defendant] and he had had a discussion at a basement room where [defendant] lived, the place that they call the hideout. [Defendant] had bragged to him about attempting to rob a man near a hamburger place in the French Quarter, and in attempting to rob the man, he thought the man was going for a gun and [defendant] popped him. He went on to say that [defendant] was surprised at how easy it was to have killed somebody, and he didn't think it would be that easy to kill somebody.
Q. Did he say anything else about anyone else that was there or anything else that may have occurred?
A. He mentioned that the man that was killed was with a woman and that the woman ran.
The attorney further testified that after he learned of defendant's involvement in the murder, he arranged for Rowell to meet with two assistant district attorneys and two police detectives on August 30, 1995. At that meeting, Rowell allegedly repeated his statements about defendant's role in the killing of a man in the French Quarter.
Detective Daniel Wharton testified that he was present at the August 1995 meeting. When asked what information Rowell gave them about this case, the defense objected *1069 unsuccessfully. Wharton then gave a detailed account of Rowell's statements regarding defendant's alleged March 4, 1995 confession, testifying as follows:
A.... [Rowell] stated that he and [defendant] were talking. [Defendant] told them that he was attempting to rob a male and female, and the female ran off and the male was reaching inside of his jacket or his pocket for maybe something he demanded, but at the time he thought the guy was going for a weapon, and he told [Rowell] that he shot the guy.
. . . . .
A.... [Defendant] didn't know  he shot him and he was scared the first time after he shot somebody, but he thought he could do it again a second time. I recall [Rowell] telling us that.
Q. That it would be easier?
A. Yes, it would be easier a second time. [Rowell] asked [defendant], "How can you shoot somebody?" and he told him the first time he was scared, and [Rowell] said  related that he said  the second time he thought he could handle it. Something to that affect (sic).
The prosecutor also called Rowell's sister as a witness. Although the sustaining of hearsay objections prohibited the prosecutor from eliciting the details of a conversation between Rowell and his sister about defendant, the sister testified that she asked her brother in March 1995 about a conversation that she overheard at defendant's house and that her brother answered her question.
Generally an out-of-court statement, such as the ones made by Rowell, is inadmissible as hearsay. La.Code Evid. art. 802. However, La.Code Evid. art. 801 D(1)(a) classifies as non-hearsay a prior statement of a witness at trial that is inconsistent with the witness' trial testimony and was given under oath at the preliminary examination or prior trial of the accused. This classification, of course, has very limited applicability.
Nevertheless, La.Code Evid. art. 607 D(2) permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. Although such evidence is admissible for impeachment, this court has steadfastly recognized that "when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt." State v. Ray, 259 La. 105, 249 So.2d 540, 542 (1971). See also State v. White, 450 So.2d 648, 651 (La.1984); State v. Kimble, 375 So.2d 76, 79 (La.1979); State v. Allien, 366 So.2d 1308, 1311 (La.1978); State v. Williams, 258 La. 251, 246 So.2d 4, 5 (1971); State v. Whitfield, 253 La. 679, 219 So.2d 493, 497 (1969); State v. Barbar, 250 La. 509, 197 So.2d 69, 71 (1967); State v. Willis, 241 La. 796, 131 So.2d 792, 795 (1961); State v. Paul, 203 La. 1033, 14 So.2d 826, 828 (1943); State v. Blassengame, 132 La. 250, 61 So. 219, 224 (1913); State v. Robinson, 52 La. Ann. 616, 27 So. 124, 128 (1900); State v. Reed, 49 La. Ann. 704, 21 So. 732, 733 (1897).
This long-standing jurisprudential rule is further buttressed by La.Code Evid. art. 105, which provides in part as follows:
When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.
See also George W. Pugh et al., Handbook on Louisiana Evidence Law 367(1997), recognizing that "the prior inconsistent statements of a non-party witness ... may be employed only to attack the witness's credibility, and not for their truth value".
Despite this consistent rejection of prior inconsistent statements of a non-party witness whose principal probative value is to prove the guilt of the accused, the question of the admissibility of these statements continues to cause difficulty in the trial courts. It is therefore appropriate to analyze the history and purpose of La.Code Evid. art. 607, which contains a relevancy balancing test for extrinsic evidence that this court has never addressed. Article 607 provides:

*1070 A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. (emphasis added).
When Federal Rules of Evidence 607 and 801 were initially promulgated, the advisors proposed a broad rule of impeachment (i.e., attacking credibility) of a witness by the party calling the witness, as well as the use of any prior inconsistent statement of the witness as substantive evidence of that previous statement. That scheme did not require the party calling the witness to be surprised or unaware that the witness would give unfavorable testimony. The party, in effect, had the right to present a turncoat witness and also to present the witness' inconsistent prior statement as substantive evidence, thereby allowing the jury to decide which statement, the trial testimony or the prior inconsistent statement, was the truth. See Glen Weissenberger, Federal Rules of Evidence: Rules, Legislative History, Commentary and Authority, §§ 607.1, 607.2 (1996).
However, in the process of amending and eventually adopting Rule 801, Congress rejected the broad doctrine of substantive use of all prior inconsistent statements and restricted the substantive (or non-hearsay) use to those statements which were "inconsistent as to the declarant's testimony and [were] given under oath....." The "given under oath" requirement significantly limited the substantive use of such statements to statements given, for example, in a deposition or to a grand jury.
When the Louisiana State Law Institute proposed the Louisiana Code of Evidence to the Legislature, the substantive impeachment rule was even further restricted. Only those inconsistent statements that were given in "the accused's preliminary hearing or... prior trial [where the] witness was subject to cross examination by the accused" are classified as non-hearsay and admissible as substantive evidence. La.Code Evid. art. 801 D(1)(a). Otherwise, prior inconsistent statements are only admitted to impeach or to contradict the witness's trial testimony, i.e., solely to discredit the witness; these statements cannot be used to divulge the content of the prior statement for the purpose of inviting the jury to believe the content of the statement. La.Code Evid. art. 607 D(2).
Because the Louisiana code contained the broad impeachment rule of Fed. R.Ev. 607 that a party can impeach his own witness (without a showing of surprise or hostility), the redactors added Subdivision D to Article 607, governing the use of extrinsic evidence[5] to impeach. Significantly, that article admonishes the trial court to admit extrinsic evidence (i.e., independent proof of the statement through, for example, the testimony *1071 of a police officer), when that evidence is offered solely to impeach, only if the probative value is not "substantially outweighed" by "unfair prejudice." Thus Article 607D(2) adopts a relevancy balancing test (similar to that in Article 403) to determine whether the offered evidence is sufficiently relevant on the issue of credibility to be admissible.
The purpose of impeachment is to diminish the credibility of a witness. When the testimony of a witness in court is inconsistent with a prior statement by the witness, the party calling the witness may be able to use the prior statement to impeach the witness  that is, to diminish his or her credibility. The right to use the prior statement depends upon the probative value of the statement as to the credibility of the witness' in-court testimony, as measured against the prejudicial impact that potentially may result from the jury's improper use of the evidence. Weissenberger, supra, at § 607.3. In performing the weighing process, the court should consider the relevancy of the prior statement to the credibility of the in-court testimony and the motivation for the impeachment. The court should further consider the prejudicial effect of the statement if used improperly as substantive evidence, and the effectiveness of a limiting instruction in avoiding improper use of the statement. Id.
One purpose of allowing impeachment by a prior inconsistent statement is to prevent a party from being damaged by the party's own witness. Thus if a witness testifies at trial that he or she saw the accused in another state at the time of the crime, the prosecutor can offset the damage of that testimony by impeaching the witness with a prior statement by the witness of his or her presence in the vicinity of the crime at the time of the crime. This is appropriate use of a prior inconsistent statement to impeach a witness regarding the substance of the witness' incourt testimony that damaged the prosecutor's case. However, a statement by a witness that merely denies[6] making a prior statement which incriminated the accused does not, by the substance of the in-court testimony, damage the prosecutor's case (although "damage," of course, is suffered by the loss of favorable evidence). Indeed, there is nothing of substance in such a denial for the prosecutor to impeach. The denial itself is non-evidence, and it is unnecessary to attack the credibility of non-evidence. The only purpose in using a prior inconsistent statement to attack such a denial is to expose to the jury inculpatory evidence that is substantively inadmissible.
In this case, Rowell's testimony, when reviewed in the context of the entire record, was at most unhelpful (even if inconsistent) and did not detract from the other evidence offered by the prosecution. Thus the prior statement, while admitted solely to contradict, was much more likely to be considered by the jury for the truth of the matter asserted, and indeed it was predictable that the jury would so misuse the evidence. Even with a limiting instruction, the potential for great prejudicial impact (i.e., the substantive use of the statement by the jury) substantially outweighed its marginal tendency to neutralize evidence which was merely unhelpful to the prosecution.
When Rowell denied that he provided the authorities with information about the present case, it was not appropriate for the prosecutor to call Rowell's attorney and a police officer to contradict that denial by testimony of the contents of the statement Rowell denied. The so-called impeachment evidence had little or no probative value as to the substance of Rowell's in-court testimony and had the potential for extreme prejudice if misused by the jury for the substance of the inculpatory content. The prosecutor's using the prior inconsistent statement of a nonparty principally to reveal to the jury inadmissible evidence of the guilt of the accused simply was not impeachment of the witness, but was an obvious attempt to put both statements of the witness before the jury and allow the jury to decide which one was true. Both the federal and state legislatures rejected *1072 this strategy in the use of prior inconsistent statements.
In the context of a case where the prosecutor calls a witness who gave a prior statement favorable to the prosecutor's case, but has now become a turncoat witness, and the prosecutor offers the favorable statement as a prior inconsistent statement to "impeach" the witness, the court is required to utilize the weighing process of La.Code Evid. art. 607 D(2) in determining whether to allow the introduction of the statement at the trial through the testimony of a police officer or other person who received the statement. The evidence in this case should have been excluded under the weighing process of Article 607 D(2).
Improper Use of the Evidence After Admission
We have concluded that the so-called impeachment evidence was improperly admitted, as any impeachment of the witness' non-evidence by his denial was greatly outweighed by the prejudicial effect of the jury's potential misuse as substantive evidence. Nevertheless, even if the issue of admissibility was close, we would be compelled to reverse this conviction because of the prosecutor's flagrant misuse of that evidence for purposes that the prosecutor himself admitted was an improper use of such evidence.
When the defense objected to the admission of the testimony of Rowell's attorney and Detective Wharton, the prosecutor argued that the testimony was "clearly" not elicited for the purpose of showing the truth of Rowell's statements, but was rather elicited for the sole purpose of impeaching Rowell's trial testimony by showing that he had made prior inconsistent statements to these persons. Notwithstanding these assurances that the evidence was elicited solely for impeachment purposes, the prosecutor in closing arguments did, in fact, argue vigorously the truth of the testimony of Rowell's attorney and the detective as substantive evidence of defendant's guilt. The prosecutor made such improper comments as "[W]e've got witness after witness saying what [defendant] really said about shooting this man and somebody running off," "Thank God that the truth came out and James Rowell told the truth," and "[The defense is objecting] because they know all of that [testimony] goes to prove that we have the right man in here."[7]
*1073 Moreover, with regard to Rowell's sister's testimony, the prosecutor made arguments that were wholly unsupported by the evidence in the record. As noted above, defense objections prevented Rowell's sister from giving any details about the content of Rowell's statements to her. However, during closing arguments, the prosecutor argued that the sister's testimony demonstrated that Rowell had told his sister the same story that he had told his attorney regarding defendant's involvement in the shooting. This assertion clearly falls outside of the record.
It is clear from the above-quoted excerpts that the prosecutor offered testimony as impeachment evidence, disclaiming its use as substantive evidence of defendant's guilt, and then used that evidence in closing argument solely for the truth of the hearsay statements. Further, the prosecutor, over objection, improperly urged the jury to accept the substance of the hearsay statements and to use the statements to convict defendant. These clear violations of defendant's right to a fair trial, unless harmless, require reversal of the conviction.
Harmless Error Analysis
A conviction generally will not be reversed for improper closing argument, unless the court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. State v. Kyles, 513 So.2d 265, 275 (La.1987); State v. Sharp, 418 So.2d 1344, 1349 (La.1982). In the instant case, the evidence of Rowell's statements that were improperly used by the prosecutor was in the nature of a confession and therefore very strong evidence of defendant's guilt. Moreover, the alleged statements regarding the ease of killing a second time were highly inflammatory. On the other hand, there was no physical evidence to connect defendant to the charged offense. The entire case for the prosecution rested upon (1) the positive identification of defendant by Babin, which was arguably weakened by the post-trial discovery of Babin's exculpatory statement shortly after the murder that the prosecutor chose not to disclose to the defense,[8] (2) the two tentative identifications of defendant by the cook and the tour member, and (3) the fact that defendant brought to the attention of the police an error regarding the date of the offense listed in the arrest warrant. Under these circumstances, we are unable to say that the prosecutor's improper use of the statements by Rowell, in which defendant allegedly bragged about the murder of Gerardi and predicted that it would be easier to kill a second time, did not improperly influence *1074 the jury and contribute to the guilty verdict.
Decree
For the foregoing reasons, the conviction of first degree murder and the sentence of death are reversed. The case is remanded to the district court for a new trial.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] The other two teenagers were never identified.
[2] The prosecutor did not disclose this obviously exculpatory statement to the defense prior to trial, as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The defense discovered this information through an anonymous communication during the trial, but after completion of the guilt phase.
[3] The pertinent colloquy between Rowell and the prosecutor was as follows:

Q. Did you ever specifically have a conversation on March 4th of '95 with [defendant] in his basement in his house on Maray Street about a shooting in the French Quarter?
A. No, I don't.
Q. Did you ever tell the District Attorney's Office and homicide detectives about his conversation?
A. I just said what my lawyer told me to say.
. . . . .
Q. Now, do you also remember telling homicide detectives, Detective Dwight Deal and Detective Tony Small, about this conversation you had with [defendant] on March 4, 1995?
A. I only told them what you all told me to say.
Q. Do you remember telling the detectives as well as me that you remember first of all that it was March 4th because you had committed an armed robbery of Elaine McClain on March 4th, do you remember saying that?
A. I said I just said what everybody told me to say.
. . . . .
Q. Did [defendant] make a statement to you admitting to shooting a man in the French Quarter on March 2, 1995 by a burger place on Esplanade?
A. No, sir.
[4] When the defense objected to this evidence, the prosecutor assured the court that the purpose "clearly" was not to show the truth of Rowell's statement, but solely for "the purpose of impeachment."
[5] Intrinsic evidence is that elicited from the witness himself, while extrinsic evidence means any evidence other than the witness' testimony. George W. Pugh, Handbook on Louisiana Evidence Law, Article 607, Arthors' Note (7) (1998).
[6] This case is unusual in that Rowell never expressly denied making the pertinent statement to the police that defendant gave inculpatory information about the murder, but merely disclaimed the truthfulness of the statement by asserting that it was coerced.
[7] Specifically, the prosecutor argued:

[Defendant's] partner [i.e., Rowell] got on this stand and figured he would lie for his friend and try to protect him, but he couldn't, because you see the same thing he told [the prosecutor] in August was the same thing he told his own attorney before that. The same thing he told his own sister. For that man and James Rowell 
BY [DEFENSE COUNSEL]: Objection, your Honor.
BY THE COURT: Objection, overruled.
CLOSING ARGUMENT RESUMED BY [PROSECUTOR]:
The same exact thing. Again,
BY [DEFENSE COUNSEL]: Objection.
BY THE COURT: Overruled.
CLOSING ARGUMENTS RESUMED BY [PROSECUTOR]:
They objected then and they are objecting now to it, because they know all of that goes to prove that we have the right man in here. Remember what James Rowell's sister said. I asked because I heard them say something. I asked, "What did he do?" They wouldn't say. Later she pulled the brother aside and said, "James, what did [defendant] do?" and James told her. That was the same thing he told his attorney. That's the same thing he told [the prosecutor], and that's the same thing he told Daniel Wharton from the Seventh District, and that's what it was. He told him that he had committed a robbery and shot a man, a robbery with a man with a woman by a burger place on Esplanade. Is that all he said? No. He even said he was surprised how easy it was, and easy it would be to do again. That's death, ladies and gentlemen. That is evil personified .... (emphasis added).
Later in his closing argument on rebuttal, the prosecutor argued:
Thank God that the truth came out and James Rowell told the truth. God bless him.... What did his lawyer say ... [H]e said, "Now, I told that young man, if you want to see any hope for yourself, if you want to get close to that 15 years to 25 years, you better tell them what you know if anything." The first meeting that [Rowell's attorney] had was with me, Detective Wharton, another D.A. and the client himself and Tony Small, and what was said? What was said? Other than corroborating the time of the photographic identification that [defendant] was at a hamburger place on Esplanade and he saw a man and a woman. He went to the man and he tried to rob the man and he shot him.
BY [DEFENSE COUNSEL]: Objection, Your Honor.
BY THE COURT: Overruled.
CLOSING ARGUMENT RESUMED BY [PROSECUTOR]:
And the lady ran off. Something else that he said or two other things that he said. Something else that he said that I think lends credibility to the statements that he says were made to him, because what he does is try to give some mitigating circumstances, some reason for why he did this, and he said that he thought the man was going in his pocket for something. He's not sure what it was and that's why he shot him. Do you think if Tony Small, Danny Wharton and [Rowell's attorney] weren't given some damning information that would be included in that statement? Are you following me? The truth comes out. He also said something else, he didn't know it was going to be that easy. It would give me chills if I was walking in the street and I saw somebody with a face like that.... If you are thinking about James Rowell's testimony and you thinking about how James Rowell testified concerning the statements made to him or not made to him, and about the impeachment of that and the fact that we've got witness after witness saying what he really said about shooting this man and somebody running off. Make your voice heard because you've got 12 minds working on this.... Common sense tells you that three identifications, that the statement made by the defense saying the day of the crime that the statement by the defendant to James Rowell to Yolanda Rowell that he had killed someone.... (emphasis added).
[8] Because we reverse the conviction based on the erroneous admission of testimony as impeachment evidence and the prosecutor's use of that evidence in closing argument stressing the substantive value of that evidence, we do not reach the issue of the prosecutor's failure to disclose exculpatory evidence material to defendant's guilt, as clearly required. As Justice Souter warned in Kyles, a prosecutor anxious about "tacking too close to the wind will disclose a favorable piece of evidence" and "will resolve doubtful questions in favor of disclosure." 514 U.S. at 439, 115 S.Ct. at 1568. However, the evidence now is in defendant's possession and will be available at the new trial.