811 So.2d 1112 (2002)
STATE of Louisiana
v.
Tony BURBANK.
No. 2001-KA-0831.
Court of Appeal of Louisiana, Fourth Circuit.
February 27, 2002.
Rehearing Denied April 16, 2002.
*1114 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, for Defendant/Appellant.
Court composed of Judge CHARLES R. JONES, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.
MICHAEL E. KIRBY, Judge.

STATEMENT OF CASE
On September 11, 1997, the defendant, Tony Burbank, was indicted for the first degree murders of Larry Welch and Jeffrey Jackson. The defendant entered a plea of not guilty to both counts. A suppression hearing was held on February 17, 1998 after which the trial court denied defendant's motions to suppress evidence and confession. A subsequent suppression hearing was held on June 19, 2001, at which time the trial court denied defendant's motion to suppress identification. After a jury trial on August 15, 2000, the defendant was found guilty as charged on both counts. The penalty phase was conducted on August 17, 2000. The jury recommended life imprisonment at hard labor without benefits on both counts. On September 28, 2000, the trial court denied defendant's motions for new trial and post verdict judgment of acquittal. The trial court then sentenced defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant's motion for appeal was granted and a return date of December 7, 2000 was set.

STATEMENT OF FACT
Dr. Richard Tracy, a forensic pathologist with the Orleans Parish Coroner's Office, performed the autopsies on the two victims. Dr. Tracy testified that Jeffrey Jackson suffered five gunshot wounds, two *1115 of which were fatal. Dr. Tracy further stated that Larry Welch sustained five gunshot wounds to the back and right buttock, one of which passed through the heart and was immediately fatal.
Officer Kevin Balancier testified that he responded to a call in the 8800 block of Cohn Street at approximately 12:30 a.m. on January 19, 1997. When he arrived on the scene, he observed two black males lying face up on the street near a blue vehicle. The officer requested an emergency medical unit and taped off the scene. The officer assisted in the defendant's arrest a few days later.
Officer John Gahagan, a crime scene technician, processed the crime scene in the 8800 block of Cohn Street. He recovered eleven spent nine-millimeter casings and three bullets.
Sergeant Louis Gaydash assisted in the investigation of the homicides by canvassing the area for potential witnesses. The officer testified that he took a statement from Paula Hess. He stated that Ms. Hess was sober and reluctant to talk.
Detective Gerard Winbush, a firearms examiner, testified that he examined the ammunition and weapon recovered during the homicide investigation. The detective stated that the bullets recovered from Welch's autopsy were nine-millimeter bullets. One nine-millimeter bullet was recovered during Jackson's autopsy. Three nine-millimeter bullets were recovered from the crime scene. All the bullets were fired from the same weapon. The detective also testified that all the casings found on the scene were also from the same weapon.
Paula Hess testified that on January 19, 1997, she went to Larry Welch's house. Larry, Larry's son, Cassandra Scott and another man were at the house. She and several others were drinking and doing drugs. Later that evening, Larry and a friend decided to get something to eat. Larry and his friend were shot outside of Larry's house. She testified that she did not remember anything about the shooting. She and Cassandra were in the front room talking. The next thing she remembered was being outside and seeing Larry and his friend lying dead in the street. She stated that she was intoxicated from the drugs and alcohol. Ms. Hess testified that she did not recall giving a statement to the police. She described the perpetrator as a big guy but not muscular. She was not able to identify the defendant as the perpetrator.
Detective Robert Hoobler was the lead investigator in the homicide investigation. Upon his arrival at the scene, the detective observed a small blue Dodge Colt parked in the street in front of 8816 Cohn Street. The two victims were lying directly behind the vehicle. There were spent casings in the street along with a baseball bat and the victims' clothing.
The detective stated that witnesses to the incident were located inside the residence at 8816 Cohn Street. The witnesses told the detective that the victims were trying to push start the vehicle when the gunman appeared and started shooting. Detective Hoobler interviewed both Paula Hess and Cassandra Scott. He took a statement from Cassandra Scott. Ms. Scott stated that she was looking out of the front window of the apartment when the shooting occurred. Ms. Scott identified the defendant in a photographic lineup as the perpetrator. She knew the defendant by his nickname of "Dogboy."
Detective Hoobler arrested the defendant and searched the defendant's house. *1116 He recovered a Smith & Wesson forty caliber semi-automatic pistol, one metal ammunition magazine, eleven live rounds of forty-caliber ammunition, and one live round of nine-millimeter Luger ammunition from the defendant's house. The detective later learned that the blue car was stolen but had not been reported as stolen because the owner did not realize the vehicle was missing.
Cassandra Scott testified that she was at Larry Welch's house on Cohn Street at approximately 12:30 a.m. on January 19, 1997. She, Larry, Paula Hess and Jeffrey Jackson were using narcotics and drinking beer. Ms. Scott stated that she was hungry and Larry and Jeff decided to go to Church's Fried Chicken. She walked them to the door. By the time she closed the door and walked to the sofa, she heard gunfire. She looked out of the window and saw the defendant with a gun in his hand. After the shooting stopped, Larry called out her name. She went to him and he died in her arms. When the police arrived on the scene, Ms. Scott gave a statement to Detective Hoobler. Ms. Scott told Larry's son to go to his grandmother's house and tell his grandmother that Larry had died.
Ms. Scott admitted that she was incarcerated at the time of trial and had been incarcerated for several months. She stated that while she was in prison, an investigator hired by the defendant's family visited her. He told her that he could help her with her situation if she stated that she did not see the shooting. Ms. Scott then signed a paper that stated that she did not see the shooting. However, Ms. Scott recanted that statement and gave another statement that she did see the shooting. She identified the defendant in a photographic lineup as the perpetrator. She admitted to a prior conviction for crime against nature.
Robert Smith testified that the defendant's family employed him as a private investigator. At the time of trial, he was employed by OIDP as an investigator. Smith stated that he visited Cassandra Scott in jail. He told her that he had been hired by the defendant's family as an investigator and asked her if she would give him a statement. Smith denied making any promises or inducements in exchange for the statement. Ms. Scott asked him for his assistance in getting her children returned to her. Smith stated that he would try to help if he could.
Louis Burbank, the defendant's brother, testified that the defendant was with him at his girlfriend's house at the time of the shooting. Burbank stated that the defendant was one of several people who went to Burbank's girlfriend's house for a weekend party that began Friday night, January 17, 1997 and continued until Sunday, January 19, 1997. Burbank and the defendant learned of the shooting at a block party on Sunday afternoon.
Randy Armstead and Perry White were two of the people at the weekend party at the house of Ernesta Smith, Louis Burbank's girlfriend. Armstead and Perry testified that the defendant was at the house the entire weekend.
Chrissy Burbank, the defendant's sister, testified that she had spent the week at Ernesta Smith's house while Smith's mother was out of town. She testified that the guys came over on Friday night and stayed until Sunday. Ernesta called 911 on Friday night because she was mad at Louis. The witness stated that the defendant was at the house the entire weekend. They learned that the defendant was wanted *1117 for murder when they went to the block party on Sunday afternoon.
Ernesta Smith, Louis Burbank's ex-girlfriend, testified that she had a weekend party at her house the weekend of January 17-19, 1997. Ms. Smith stated that the defendant was at her house from Friday night through Sunday morning. She admitted that she called 911 early Saturday morning because she was upset with Louis. A police unit came to the house but she did not answer the door when the police officer knocked on the door. She learned that the defendant was wanted for murder at the block party on Sunday afternoon.
Claudia Burbank, the defendant's mother, testified that the police came to her house on January 22, 1997 to arrest the defendant. She stated that the defendant, Louis and Chrissy were at Ernesta Smith's house the weekend of January 17-19, 1997. Ms. Burbank testified that the officers found a gun under the sofa in her living room. She stated that Louis had found the gun about a week before the murder and gave the gun to his father. She thought her husband had gotten rid of the weapon. She stated she never saw the defendant with a gun.
Mary Knight, an employee with the New Orleans Police Department, testified that at approximately 1:37 a.m. on January 18, 1997, someone dialed 911 from 2018 Dumaine Street. Unit 104 was dispatched to the residence. The unit arrived at the residence at 1:54 a.m.
Eugene Jarrow testified that he had been incarcerated in parish prison since July of 1997. He stated that he knew Cassandra Scott and that she smoked crack. The witness admitted convictions for attempted second degree murder, attempted possession of marijuana, and possession of heroin.

ERRORS PATENT
A review of the record also reveals that two errors occurred during the defendant's sentencing. The record reveals that the trial court sentenced defendant immediately after denying defendant's motions for new trial and post verdict judgement of acquittal. There is nothing in the record to suggest that the defendant waived his right to a delay in sentencing. See La.C.Cr.P. art. 873. In State v. Augustine, 555 So.2d 1331 (La. 1990), the Louisiana Supreme Court held that failure to waive the twenty-four hour delay voided the defendant' sentence if the defendant attacks his sentence, even though the defendant fails to specifically allege this failure as an error on appeal. However, the Fourth Circuit, in State v. Collins, 584 So.2d 356 (La.App. 4 Cir. 1991), held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. Therefore, in the present case where no error is raised as to the defendant's sentence, the failure of the trial court to observe the delay period is considered harmless error.
A review of the sentencing transcript reveals that the trial court did not impose sentences on both counts of first degree murder. The trial court only imposed sentence on one count of first degree murder and did not specify which count he was imposing sentence thereon. As a result, the defendant's sentence must be vacated and the matter must be remanded for resentencing on both counts.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant argues that the trial court erred *1118 in failing to allow defense counsel to cross examine Cassandra Scott regarding the existence and terms of a plea agreement under negotiation in her pending criminal case. The defendant contends that there was a plea agreement between Ms. Scott and the State regarding a pending charge of possession of cocaine. The defendant proffered the testimony of Ms. Scott's attorney who stated that there had been discussion concerning a plea agreement. Under the agreement, Ms. Scott would plead guilty as charged and receive a sentence of one year at hard labor. The State would agree that it would not multiple bill Ms. Scott. However, Ms. Scott's attorney testified that the plea agreement was never formalized. In fact, as defendant noted in his brief, Ms. Scott went to trial for the offense and was acquitted.
The defendant relies upon State v. Rankin, 465 So.2d 679 (La.1985) in support of his argument. In Rankin, the Louisiana Supreme Court held that the defendant was entitled to cross examine a witness and the witness' attorney about a plea agreement entered into with the State in which the witness agreed to testify against the defendant truthfully. The Court stated:
The defendant's right to confront and cross-examine witnesses, found in the Sixth Amendment to the United States Constitution, is a fundamental right and applicable to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In addition this right to confrontation is found in the Louisiana Constitution of 1974. See Article 1, Sec. 16.
In order to cross-examine a witness effectively, a defendant must be afforded the opportunity to demonstrate any bias or self-interest which is attached to a witness' testimony. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Senegal, 316 So.2d 124 (La.1975). This right to evince bias is also provided by statute:
"When the purpose is to show that in the special case on trial the witness is biased, has an interest, or has been corrupted, it is competent to question him as to any particular fact showing or tending to show such bias, interest or corruption, and unless he distinctly admit such fact, any other witness may be examined to establish the same." R.S. 15:492.
A cross-examiner is allowed wide latitude in exploring any facts that might support an inference of bias. State v. Sweeney, 443 So.2d 522 (La. 1983); 3A Wigmore, Evidence Sec. 944 (Chadbourn rev.1970). The bias must be specific as opposed to general in nature. State v. Williams, 445 So.2d 1171 (La.1984).
The possibility that the prosecution may have leverage over a witness due to that witness' pending criminal charges is recognized as a valid area of cross-examination. State v. Brady, 381 So.2d 819 (La.1980); State v. Franks, 363 So.2d 518 (La.1978); State v. Owens, 338 So.2d 645 (La. 1976); State v. Robinson, 337 So.2d 1168 (La.1976); 3A Wigmore, Evidence Sec. 967 (Chadbourn rev.1970). See also Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), for an analogous situation.
State v. Rankin, 465 So.2d at 681.
The case at bar presents different circumstances from those set out in Rankin. *1119 Unlike the witness in Rankin, Cassandra Scott did not formally enter into an agreement with the State to testify against the defendant in exchange for a lesser sentence on her pending charge of possession of cocaine. Ms. Scott's attorney testified that the parties never formally entered into a plea agreement.
The record is unclear as to whether Ms. Scott's attorney had first hand knowledge of the purported plea agreement. His testimony indicates he "picked up the case from ... the prior public defender." When asked if there had been an offer for a lesser penalty he responded: "Oh, from my understanding and taking over the file, there was a plea agreement for one year in the Department of Corrections." When the court directly asked the witness whether he had been "negotiating a deal for Cassandra Scott," the attorney responded, "No, sir." Apparently the discussion about a plea agreement had been conducted by prior defense counsel. When the court asked whether the witness had ever followed up "any of that," apparently referring to the plea agreement, the witness responded "That's `not' [sic] official Judge. Usually the Judge will change different things in the plea agreement."
Defense counsel cross-examined the witness about the existence of a plea agreement. Ms. Scott denied the existence of such an agreement.[1] Further, as defendant notes in his brief, Ms. Scott went to the trial on the narcotics charge and was acquitted. Therefore, there was no plea agreement at the time Ms. Scott testified at the defendant's trial. Accordingly, there was no error in the trial court's ruling.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant contends that the trial court erred when it refused to allow defense counsel to present a witness to testify regarding a prior inconsistent statement allegedly made to him by Cassandra Scott. The defendant sought to have Eugene Jarrow testify that Cassandra Scott told him that she did not see the defendant shoot the victims. The *1120 defendant cross-examined Scott on the issue and she denied knowing Jarrow and/or making any such statement to Jarrow.
A statement, "other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted," is hearsay. La. C.E. art. 801 C. Generally, such out-of-court statements are inadmissible. La. C.E. art. 802. An exception is the prior testimony of a witness made under oath at a prior trial or preliminary hearing of the accused, which testimony is classified as non-hearsay and is admissible. La. C.E. art. 801 D(1)(a).
Nevertheless, as noted in State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065, La. C.E. art. 607 D(2) permits the introduction of a prior inconsistent statement, even though it is hearsay, for the limited purpose of attacking the credibility of a witness. Although such evidence is admissible for impeachment, the Louisiana Supreme Court has steadfastly recognized that "when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt." State v. Ray, 259 La. 105, 249 So.2d 540, 542 (1971).
La. C.E. art. 613 requires that a distinct foundation be laid before evidence of a prior inconsistent statement is admissible to impeach a witness. The witness's attention must be fairly directed to the particular statement and he must be given the opportunity to admit the fact of his prior inconsistent statement. If the witness fails to distinctly admit the particular statement, the extrinsic evidence of the prior inconsistent statement is admissible, unless "the interests of justice otherwise require."
Finally, La. C.E. art. 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." A statement otherwise admissible as impeachment evidence may be excluded by the Article 403 balancing test. State v. Laymon, 97-1520 (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, writs denied, XXXX-XXXX (La.5/4/01), 791 So.2d 648, XXXX-XXXX (La.5/11/01), 791 So.2d 1288.
In State v. Cousin, 96-2973, pp. 11-12, 710 So.2d at 1071, the court fully discussed the considerations required in the balancing test in a similar issue, as follows:
The purpose of impeachment is to diminish the credibility of a witness. When the testimony of a witness in court is inconsistent with a prior statement by the witness, the party calling the witness may be able to use the prior statement to impeach the witnessthat is, to diminish his or her credibility. The right to use the prior statement depends upon the probative value of the statement as to the credibility of the witness' in-court testimony, as measured against the prejudicial impact that potentially may result from the jury's improper use of the evidence. Weissenberger, supra, at § 607.3. In performing the weighing process, the court should consider the relevancy of the prior statement to the credibility of the in-court testimony and the motivation for the impeachment. The court should further consider the prejudicial effect of the statement if used improperly as substantive evidence, and the effectiveness of a limiting instruction in avoiding improper use of the statement. Id.

*1121 Cassandra Scott's credibility played a pivotal role in the present case. She was the only eyewitness to the homicide who identified the defendant as the perpetrator. The jury had heard testimony from Robert Smith, the defendant's investigator, that Ms. Scott told him on two occasions that she did not see the defendant shoot the victims. However, Ms. Scott later recanted both statements. Ms. Scott testified at trial that she made those statements because she was fearful. She also stated that she did not want to testify at trial because she was afraid of retribution from the defendant's family. On cross-examination, Ms. Scott denied knowing Jarrow and/or making a statement to him. Jarrow, on direct examination by defense counsel, stated that he knew Ms. Scott and that she was a "crackhead." Defense counsel then sought to introduce testimony that Ms. Scott told Jarrow that she did not see the defendant shoot the victims. The trial court restricted the defendant's examination of the witness and did not allow such testimony into evidence. The trial court did not err when it refused to allow Jarrow to testify concerning the alleged statement made by Ms. Scott. A review of Jarrow's testimony and other testimony introduced by the defendant reveals that the defendant sought to introduce the statement not just for impeachment purposes but also to prove the truth of the matter. The defendant had already introduced evidence that Ms. Scott made statements to Robert Smith, the defendant's investigator, that she did not see the defendant shoot the victims. Defendant had also impeached Ms. Scott's credibility by cross-examining her on her drug use and prior convictions. Further, Jarrow testified that Ms. Scott was known as a "crackhead."
Accordingly, this assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3
The defendant further suggests that the trial court erred in denying defendant's motion in limine to exclude from evidence the weapon found in the defendant's home which was determined not to be the murder weapon.
The weapon, a forty-caliber semi-automatic pistol, was found underneath the sofa in the defendant's living room. Ammunition for the weapon, as well as one nine-millimeter bullet, was also recovered from the defendant's residence during the execution of the search warrant. Detective Hoobler testified that the weapon was fully loaded when it was recovered. Detective Winbush examined the weapon along with the casings and bullets recovered from the scene and the victims' bodies. The officer stated that the forty-caliber pistol was not the murder weapon. All the casings and bullets retrieved from the scene and the autopsies were nine-millimeter.
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." La. C.E. art. 401. Evidence which is not relevant is not admissible. La. C.E. art. 402. The trial court's determination regarding the relevancy of evidence is entitled to great weight and should not be overturned on appeal absent a clear abuse of discretion. State v. Whittaker, 463 So.2d 1270, 1272 (La.1985).
While the weapon was not the murder weapon, the introduction of the weapon was not error. The weapon was introduced as part of all the evidence recovered during the execution of the search warrant at the defendant's residence. Thus, the *1122 weapon was introduced as part of the investigation conducted by the police officers. The ammunition found with the weapon was introduced at the same time. The weapon and the ammunition provided evidence that the defendant was familiar with, and used guns. The evidence impeached the defendant's mother's testimony that she had never seen the defendant with a weapon. See State v. Williams, 99-1868 (La.App. 4 Cir.1/31/01), 778 So.2d 1232.
As the trial court did not abuse its discretion in admitting the weapon into evidence, this assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 4
The defendant contends that the errors discussed above cumulatively prevented him from receiving a fair trial. The defendant suggests that the errors together could not be considered harmless error.
The Louisiana Supreme Court has held that the cumulative effect of harmless errors does not warrant reversal of a conviction or sentence. State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239; State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154. As stated above, the defendant's previous assignments have been determined to be without merit. A review of the trial transcript reveals that the defendant received a fair trial. The defendant was permitted to present a defense. He had several alibi witnesses who testified that he was at a weekend party at the time of the shooting. The defendant was given great latitude in attempting to impeach the testimony of Cassandra Scott. The jury heard all of the testimony and chose to accept Ms. Scott's testimony, knowing that she had made prior inconsistent statements and that she used drugs. The jury was aware that Ms. Scott was drinking and using drugs the night of the shooting. However, the jury assessed Ms. Scott's credibility and chose to accept her testimony over the testimony of the defendant's alibi witnesses.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 5
The defendant also argues that there was an appearance of impropriety arising from the undisclosed arrest of Cassandra Scott and the related $100,000.00 bond effected to secure her presence at trial, the prosecutor's recent contempt conviction, and the trial court's subsequent entry of a judgment of acquittal on the pending charges against Cassandra Scott.
The arrest to which the defendant alludes is Ms. Scott's arrest and detention on a material witness bond. Ms. Scott testified at trial that she did not want to testify because she was fearful of retribution if she did testify. Given Ms. Scott's testimony at trial to this effect, there was no need to introduce evidence of the arrest and detention. Further, introduction of such information would have bolstered Ms. Scott's testimony concerning her fears and would have harmed the defendant's case.
The defendant also contends that Mr. Lionel Burns' conviction for contempt of court in the George Lee matter also tainted the proceedings. However, the defendant's trial occurred on August 15, 2000. As defendant was charged with first degree murder, the jury was sequestered from the time the jury was selected to the end of the penalty phase. Mr. Burns' conviction arose out of actions which occurred on October 18-19, 2000. He was not convicted of contempt until November *1123 17, 2000. Mr. Burns' conviction for contempt of court by tampering with evidence was reversed by the Louisiana Supreme Court on November 28, 2001. In Re: Lionel "Lon" Burns, XXXX-XXXX (La.11/28/2001), 800 So.2d 833. Thus, Mr. Burns' actions in the George Lee matter had no effect on the present case.
Lastly, the defendant contends that Ms. Scott's acquittal on the cocaine charge also provides for the appearance of impropriety. After defendant was found guilty as charged, Ms. Scott went to trial on the charge of possession of cocaine. Ms. Scott chose a bench trial and was acquitted by the same trial court in which the defendant had been convicted. The defendant suggests that the trial court acquitted Ms. Scott because she testified at the defendant's trial. However, the defendant has not produced a transcript of Ms. Scott's trial. Thus, there is nothing to suggest that the trial court's ruling was not correct in light of the evidence presented by the State. Defendant's allegations of possible collusion would be better addressed in an application for post conviction relief in which an evidentiary hearing could be held.
The defendant has not produced any evidence to suggest how these events may have created an appearance of impropriety in the case at bar. Accordingly, this assignment is without merit.

CONCLUSION
For the above reasons the defendant's convictions are affirmed. His sentence is vacated and the matter remanded for re-sentencing on each count.
CONVICTIONS AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING ON EACH COUNT.
NOTES
[1] Q. August 1998, you get arrested on the charge that you're in here for right now, correct?

A. Correct.
* * *
Q. You're facingyou know that you were facing at least five years on the bottom line charge, right?
A. I guess.
Q. And the District Attorney asked about your prior arrests and convictions?
A. I have three prior convictions.
Q. Three?
A. Three.
Q. That makes you a fourth offender, doesn't it?
A. Yes, it does.
MR. BURNS: Objection as to relevance, Judge....
THE COURT: And I'm going to sustain that.
* * *
Q. Now your case is set for tomorrow morning, right?
A. Yes, it is.
Q. You expect to plead guilty, don't you?
A. Yes.
Q. Yes, right?
A. Yes.
Q. Your case has been continued twenty-two times hasn't it, tell the ladies and gentlemen of the jury?
A. Yes, it has.
Q. If you're planning of pleading guilty and the twenty-two times over the last two years, why didn't you just plead guilty and get it over with?
A. To enlighten you. Before hand I was going to plead guilty and accept thirty months, but then I'm involved with another case. Another trial and they kept setting me back it wasn't my doing.