# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 08-1444


**STATE OF LOUISIANA**

**VERSUS**

**COURTNEY PAUL SAVOY**


************

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 288,660
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Jimmie C. Peters, Judges.


**CONVICTION AND SENTENCE VACATED;**
**REMANDED FOR FURTHER PROCEEDINGS.**


**James C. "Jam" Downs**
**District Attorney, Ninth Judicial District Court**
**W. T. Armitage, Jr.**
**Assistant District Attorney**
**Post Office Drawer 1472**
**Alexandria, LA 71309**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Christopher A. Aberle**
**Louisiana Appellate Project**
**P. O. Box 8583**
**Mandeville, LA 70470-8583**
**(985) 871-4084**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Courtney Paul Savoy**

PETERS, J.

A jury convicted the defendant, Courtney Paul Savoy, of simple escape in violation of La.R.S. 14:110. Thereafter, the trial court sentenced the defendant to serve five years at hard labor and ordered that the sentence run consecutive to the sentence he was serving at the time of the offense. On appeal, the defendant's counsel raises one assignment of error, and the defendant raises eleven *pro se* assignments of error. For the following reasons, we vacate the defendant's conviction and sentence and remand the matter to the trial court for further proceedings.

### DISCUSSION OF THE RECORD

The defendant's conviction arises not from his own escape from legal custody, but from the January 20, 2007 escape of a fellow inmate, Jacob Shaw. On that day, both the defendant and Shaw were inmates at the Winn Correctional Center (Winn prison) in Winn Parish, Louisiana, and had been transported to the Huey P. Long Hospital in Pineville, Louisiana. Before being transported, they were placed in handcuffs, leg shackles, and waist chains.

After the transportation van arrived at the hospital mid-morning, Becky Morgan, one of the two guards transporting the prisoners, opened the door of the prisoner compartment and reached for Shaw's waist chain to help him exit the vehicle. Once he exited the van, Officer Morgan immediately observed that Shaw's chain was not in place, but was in his hand. She slammed the door of the van, leaving the defendant inside. Shaw ran from the scene and disappeared into an adjacent wooded area.

Law enforcement authorities apprehended Shaw the next day, and the defendant's prosecution as a principal in the escape arose from a statement made by Shaw soon after his capture. Specifically, Shaw told Detective Bo Edmonds of the

Pineville Police Department that the defendant helped him plan the escape and picked the lock of one of his leg irons on the way to the hospital.

Shaw's implication of the defendant in the escape did not come immediately after his apprehension. When Detective Edmonds first interviewed him after his capture, Shaw did not implicate the defendant. Furthermore, Detective Edmonds interviewed the defendant at the hospital immediately after the escape and received no information that caused him to suspect the defendant's involvement.[1] However, after Shaw was returned to the Winn prison, Tim Wilkinson, the prison warden, contacted the detective and informed him that Shaw wished to change his statement.

Detective Edmonds traveled to Winn Parish and interviewed Shaw a second time. In that interview, Shaw informed the detective that the defendant helped him plan the escape and even picked the lock on one of his leg irons during the trip to Pineville. Detective Edmonds then conducted a second interview with the defendant on January 29, 2007, in the presence of the warden and Correctional Officer Bobby Tollar. In that interview, the defendant admitted that the hospital trip was part of a larger plan of escape. According to the defendant, he "undid one of [Shaw's] [shackles] with a bobby pen [sic]" while on the way to the hospital, but was unable to remove the other because the bobby pin had become bent. The defendant asserted in his statement that he did not plan to escape and that his involvement was to "better insure [sic] the hospital trip" because of his shoulder problems. He only removed his hands from the waist chains to pick the lock on Shaw's leg irons.

The defendant testified at trial that his first statement was accurate and that his second statement was coerced through threats from Warden Wilkinson. According

[1]The defendant told the officers who interrogated him that he never saw Shaw unlock any part of his restraints and was surprised when the escape occurred.

2

to the defendant, when he was returned to the Winn prison he was placed in lock down and questioned by the warden and his assistant two or three times. He asserted that Warden Wilkinson told him that he would remain in lock down unless he said what the warden wanted him to say—that he was involved in the planning and implementation of the escape attempt. The defendant testified that the warden informed him that if he admitted to his involvement, he would be immediately transferred out of the prison. In fact, within two weeks of his statement implicating himself in the escape, he was transferred to the Wade Correctional Center.

Warden Wilkinson also testified at trial, denying that he threatened or intimidated either Shaw or the defendant or that he made any promises to obtain the second statements. He explained that the defendant has the ability to dislocate his own shoulder and that he has used this ability many times to effect a trip to the hospital. This, according to the warden, explained the defendant's comment in his second statement that his shoulder "could better insure [sic] the hospital trip" as part of the escape plan. Furthermore, the warden testified that the configuration of the leg irons required the assistance of another person to get to the lock.

At trial, Shaw was called as a witness by the defense but was of no help because he basically restated the particulars of his second statement. According to Shaw, after they began the trip to Pineville, the defendant removed his hands from the handcuffs attached to his waist chain and helped him remove the leg iron. When he arrived in Pineville, Shaw was surprised to see that the defendant had put his handcuffs back on. He then "weighed [his] options" and decided to escape alone. However, when confronted with a letter he had written to the defendant, Shaw

3

admitted that he told the defendant in the letter that he had informed the authorities that he alone had removed himself from his shackles.[2]

**OPINION**

In this appeal, the defendant's counsel raised one assignment of error:

> The trial court denied Savoy his fundamental right to present a defense and to confront his accuser when it prevented him from impeaching Shaw with evidence of two prior inconsistent statements.

In his *pro se* brief filed with this court, the defendant raised eleven additional assignments. However, since we find merit in the defense counsel's assignment of error, we need not address the defendant's *pro se* assignments.

During Shaw's testimony, counsel for the defendant asked him about conversations he had with two other inmates at the Winn prison. The defendant's counsel implied that Shaw told these two men, Quindele Addison and Travis Richardson, that the defendant had nothing to do with the planning or effecting of Shaw's escape. Shaw acknowledged that he had after-the-fact conversations regarding his escape with both men, but denied that he told either man anything different from his testimony at trial.[3] In fact, Shaw suggested in his testimony that while they were awaiting their appearance in the trial, both men told him that they lied concerning statements made by him to get an "extended vacation from lock down" by being transported for the trial.

---

[2]Other parts of the letter introduced in evidence strongly suggest a common effort to escape because Shaw comments that he saw the defendant "freeze up" as he left the van and strongly questioned the defendant with rather explicit language concerning why he failed to follow him in the escape attempt.

[3]Shaw testified that his lock-down cell was next to Addison's when he was returned to the Winn prison and that he spoke to Addison concerning the escape. He also claims that his first exposure to Richardson after his escape attempt was when he, Addison, and Richardson shared the same holding facility in the Rapides Parish jail immediately before trial.

4

In response to this testimony, the defendant's trial counsel announced his intention to call Addison and Richardson to impeach Shaw's testimony. He stated that both men would testify that Shaw informed them that the defendant had nothing to do with the planning or execution of the escape. The state objected to the testimony, and the trial court sustained the objection. The trial court's ruling in this regard is the basis of this assignment of error. The defendant asserts that the trial court erred in depriving him of the fundamental right to present a defense and to confront his accusers.

Addison and Richardson did, in fact, testify at trial. However, they only related a conversation they overheard the day before trial began.[4] They both testified that they overheard Shaw tell the defendant's attorney that he was fearful of Warden Wilkinson and that he would agree to testify favorably for the defense only if he received a written promise that he would be transferred out of the Winn prison. While admitting that he feared all correctional officers in a general sense, Shaw denied that this conversation occurred.

In analyzing this issue, we begin with the well-established rule that a defendant's constitutional right to present a defense is fundamental and that evidentiary rules may not infringe on that right. *State v. McCullough*, 00-983 (La.App. 3 Cir. 12/6/00), 774 So.2d 1105, *writ denied*, 01-533 (La. 1/25/02), 806 So.2d 669. In fact, our evidentiary rules allow the introduction of "prior inconsistent statements and evidence contradicting the witness' testimony" for the purpose of attacking the credibility of a witness. La.Code Evid. article 607(D)(2). Such evidence "is admissible after the proponent has first fairly directed the witness'

---

[4]Because of the trial court's ruling on the state's objection, the defendant proffered the affidavits of Addison and Richardson asserting Shaw's inconsistent statements to them.

attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so." La.Code Evid. art. 613. Once the foundation is sufficient for a prior inconsistent statement, the statement is subject to the balancing test of La.Code Evid. art. 607(D)(2)—that its probative value is "substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, *cert. denied*, 541 U.S. 1115, 126 S.Ct. 1940 (2006); *State v. Cousin*, 96-2973 (La. 4/14/98), 710 So.2d 1065. The probative value of the statement must be "measured against the prejudicial impact that potentially may result from the jury's improper use of the evidence." *Id.* at 1071.

In rejecting the defendant's request to allow Addison and Richardson to testify concerning the alleged conversations, the trial court did not reach the balancing requirement. Instead, the trial court concluded that the defendant had failed to lay the proper foundation for introduction of the evidence.

> [Y]ou didn't bring [Shaw] date, time and place. You didn't ask him, you just said, did you make this statement, which meant since he was born until today's date. And to impeach him you have to do that foundation.
>
> . . . .
>
> Was it in Louisiana or was it in Texas? Was the sun shining, was it dark, what prison they were in. I mean, you gonna have to bring . . . you're gonna have to try to re . . . have him go through the computer in his mind and ask him when it was made. And that's the foundation that's required under the law . . . you haven't provided the foundation to set him up to impeach 'im, because those questions were not asked . . . of Mr. Shaw.

Thereafter, the following dialogue relative to how the foundation should have been laid transpired between the counsel for the state and the trial court:

6

BY [STATE'S COUNSEL]:

[I]f he's got a statement that . . . he knows is reliable and somebody can rebut it and he says, I didn't make that statement, then he turns around and asks, on such and such a date, didn't you say this to such and such a person.

BY THE COURT:

Yes or no.

BY [STATE'S COUNSEL]:

[A]nd he says, no. Then, then you can put that guy on and say on such and such a date, ah, didn't so and so say to you this.

BY THE COURT:

That's the correct way to do it.

While we agree with that analysis generally, we find that the proper foundation was laid for the testimony of Addison and Richardson.

Of critical importance in our analysis is the fact that Shaw not only admitted having conversations with Addison and Richardson after his failed escape, he remembered specific details of the conversations. We find that in this case, a detail such as the date of the alleged statement is immaterial as any such statement, if made, was clearly made after the escape,[5] and while not agreeing with Addison's or Richardson's version, Shaw's detailed knowledge of the particular conversation was implied by him recognizing it. Shaw fairly directed himself to the conversation at issue, he had a fair opportunity to admit that he told Addison and/or Richardson that the defendant was uninvolved, and he failed to do so. All the requirements of Article 613 were satisfied by Shaw's acknowledgment of the conversation. That being the case, extrinsic evidence of Shaw's alleged statement was admissible to establish the

---

[5]The proffered affidavits suggest that the conversation with Addison occurred in July of 2007, and the conversation with Richardson occurred on October 17, 2007.

fact of contradiction for the sole purpose of Shaw's impeachment and not to prove the truth of the defendant's guilt or innocence. La.Code Evid. art. 613; *Juniors*, 915 So.2d 291. However, reaching that conclusion does not end our inquiry.

The question we must now consider is whether the statements are admissible under the balancing test of Article 607(D)(2). Without the testimony of Addison and Richardson concerning these conversations, the jury was left with Shaw's two conflicting statements: Shaw's letter to the defendant which seems to both implicate and exonerate the defendant; the defendant's conflicting statements; and the testimony that both Shaw and the defendant had a fear of the authorities having control over their lives as incarcerated individuals. The jury obviously chose to accept the evidence pointing to the defendant's involvement in the offense and returned a guilty verdict.

The defendant suggests that had the jury been allowed to hear the testimony of Addison and Richardson concerning Shaw's continued conflicting statements, it would have returned a different verdict. The state argues primarily that the trial court was correct in concluding that the defendant failed to lay a proper foundation for the admissibility of the statements. In the alternative and citing *Juniors*, 915 So.2d 291, the state argues that any error did not affect the substantial rights of the defendant.

As pointed out in *Juniors*, 915 So.2d at 331, "[t]he test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error." While we agree with the state's brief that the use of Addison's and Richardson's testimony was an attempt to impeach Shaw's testimony

8

and to bolster his intimidation defense and that the jury rejected these attempts, we cannot say beyond a reasonable doubt that the jury would not have reached a different verdict if confronted with evidence of other inconsistent statements by Shaw. We find that there is a reasonable possibility that the error contributed to the conviction, and we cannot declare that the error is harmless beyond a reasonable doubt. Thus, we find merit in this assignment of error. Accordingly, the defendant's conviction and sentence are vacated and the matter is remanded for a new trial.

## DISPOSITION

For the foregoing reasons, we vacate the defendant's conviction and sentence and remand this matter to the trial court for further proceedings.

**CONVICTION AND SENTENCE VACATED; REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS.**