812 So.2d 612 (2002)
STATE of Louisiana
v.
Willie HARRIS, Jr.
No. 2000-K-3459.
Supreme Court of Louisiana.
February 26, 2002.
Hans P. Sinha, New Orleans, Counsel for Applicant.
*613 Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Leslie P. Tullier, Counsel for Respondent.
KNOLL, Justice.
This manslaughter conviction concerns a discovery violation by the State. The crux of this case is whether the defendant can make the necessary showing of prejudice as a result of the State's discovery violation. The defendant contends that the trial court erred in denying his motion for a mistrial when he learned during the first day of trial that the State failed to reveal in pre-trial discovery that it was aware of a threatening statement the defendant made about the victim shortly before the shooting. Finding that the defendant failed to prove that this discovery violation prejudiced him, we affirm the defendant's conviction and sentence.

FACTS
As a backdrop to this case, we point out that the defendant, Willie Harris, Jr., was romantically involved with two women at the same time. The defendant testified that he and the victim, Christina Hannon, had been romantically involved for five or six years prior to her death and the two of them had lived together off and on during 1996 at his apartment in the Iberville Housing Project. The defendant also testified that he began a relationship with Juffere Johnson in 1995. As a result of that latter relationship, defendant and Johnson had a daughter on November 17, 1996. Although Johnson suspected that the defendant was seeing another woman, she never met the victim.
On February 3, 1997, the victim and the defendant along with Rodney Weston and his girl friend, Natasha Washington, were at the home of defendant's mother. Earlier that morning, the defendant had visited Johnson at her home in Gretna. At that time, the defendant told her that he was going to his apartment in the Iberville Housing Project to gather his clothes and that he was going to return to stay with her at her Gretna apartment When the defendant returned to his mother's home later in the day, the defendant and the victim began arguing about breaking up. After the argument began to upset the defendant's mother, who was ill at the time, the foursome returned to the apartment that the defendant and the victim shared in the housing project. According to Weston, he heard the defendant strike the victim with his hand as they boarded the van.
At this point the defendant's recollection of the facts diverges from that of the two other witnesses at trial who shed light on what transpired just before and just after the shooting. These two witnesses are Weston and Chiara O'Connor, the victim's cousin who also resided at the housing project. Although only the defendant and the victim were present in the apartment at the time of the shooting, these two witnesses elaborated on the facts which frame this shooting.
Weston stated that when they arrived at the apartment,[1] Weston's girl friend stayed in Weston's van as the other three went into the apartment. When the victim and the defendant continued to argue, the victim left the apartment at Weston's urging. When Weston later returned to check on his girl friend in the van, Weston saw the defendant walking the victim to the rear entrance of the apartment; as observed by Weston, the defendant had his hand *614 around the victim's neck. When Weston returned to the apartment, he saw the victim sitting on the bed in the living room and the defendant standing next to her holding a gun to her head. The gun was either a .38 or .32 caliber weapon, but he was not sure.[2] As described by Weston, he picked up a screwdriver and lodged it between the firing pin and the gun barrel to prevent the gun from discharging.[3] As he and the defendant struggled, Weston yelled at the victim, urging her to run; despite his warnings, the victim did not move. Ultimately, Weston surrendered the gun to the defendant. Approximately ten seconds later, as Weston walked out of the rear entrance of the apartment, he heard one gunshot. Even though Weston told defense counsel on cross-examination that he did not know what happened in the room as he walked out, i.e., whether the victim reached for the gun or tried to take it from the defendant, he was clear that he heard only complete silence as he strode to the rear of the apartment. When he returned to the apartment after hearing the gunshot, Weston saw the gun in the defendant's hand and the victim had been shot in the head. Weston and his girl friend then drove to the police station to report the shooting.
The victim's cousin, Chiara O'Connor, another housing project resident, testified that she saw the victim on the evening of February 3 in the Iberville Housing Project just before the shooting. She stated that the victim approached her and several others as they were visiting in a common area in the project and asked for a cigarette. After visiting with the group for approximately ten minutes, the victim left to hide from the defendant in an abandoned building in the project. Eventually, however, the defendant found the victim after she returned to O'Connor and her friends. She stated that the defendant surprised the victim and embraced her playfully. O'Connor followed the two as they proceeded to their apartment. As they neared the apartment, O'Connor testified that the defendant slapped the victim in the face and he and the victim entered the apartment. Approximately forty-five seconds later, O'Connor heard a single gunshot. At that point, O'Connor returned to her apartment. She stated that she did not know that the gunshot came from within the defendant's apartment until fifteen minutes later when a neighbor told her about the victim's death. She later returned to the defendant's apartment. There she pointed out the defendant to the police as the victim's killer as he stood outside the apartment asking what had happened to his old lady.
The defendant testified in his own behalf. He stated that at the time of the victim's death, the two of them were parting ways. Although he had visited Juffere Johnson that morning, he did not tell the victim that he was reuniting with Johnson. However, when he entered his apartment *615 and he began to pack his bags, the couple began to argue because he was leaving.[4] The defendant claimed that when he went to retrieve cigarettes from his starter jacket which lay on the couch, he picked up the gun when it fell out of the pocket of the jacket. As the defendant picked up the gun, Weston entered the apartment, grabbed him, and told the victim to run. At that point, the victim left the apartment. After the defendant and Weston struggled, the defendant left the apartment and telephoned Johnson to tell her that he would be late. As he returned to his apartment, the defendant saw the victim in the driveway of the apartment complex, grabbed her shirt sleeve near the shoulder, and told her to come with him. He denied striking her as O'Connor had stated. They returned to the apartment and continued to argue. When the defendant walked to the door, he heard a gun cock; as he turned, he saw the victim pointing the gun at him. The defendant testified that as he and the victim struggled over the weapon, it accidentally discharged, hitting the victim in the head.[5] The defendant stated that the victim died as he held her in his arms. He testified that he loved the victim and did not intend to kill her. He further stated that as Weston returned to the apartment after the gunshot, he told him that the shooting was an accident. The two of them then left the apartment. The defendant claimed that he returned to the apartment, panicked, and left again. After wandering about Canal Street, he returned to the apartment thirty minutes later to find police at the scene.
At this point, Detective Terence Philips, the lead homicide investigator on the scene, stated that the shooting took place at approximately 7:20 p.m. on February 3. When he arrived at the scene of the crime, he entered defendant's apartment through the kitchen door and observed the victim lying in a supine position on the den floor with coagulated blood on the floor around her head. The victim was between a bed and a sofa, with her head facing the door which leads to the courtyard. At about 8:57 p.m., Officer Lester Marshall, one of the policeman first on the scene, informed Detective Phillips that the defendant was being detained and that he wanted to make a statement. At this point, the police arrested the defendant, Mirandized him, and then transported him to central lockup to give a statement. In an oral taped statement the defendant admitted that he and the victim had argued all day. He also stated that while he and the victim were arguing in his apartment, he picked up the gun on the couch and aimed it at the victim to scare her. He also admitted that he shot the victim, but maintained that the victim pushed him as they tussled and that the gun, which was aimed at her waist, accidentally discharged.[6]
*616 Dr. Michael D. Defatta, a forensic pathologist at the Orleans Parish Coroner's Office, testified that he autopsied the victim's body and determined that she suffered a close-range gunshot to the left side of the head. Based on the soot and stippling around the entrance wound,[7] Dr. Defatta opined that the muzzle of the murder weapon was twelve inches or less from the victim's head when it was fired. His close observation of the victim led him to conclude that there was only a slight deviation of a 10 to 20 degree angle of trajectory as the bullet moved predominately left to right through the cranium.
The State charged the defendant with second-degree murder. After a jury trial, the defendant was found guilty of manslaughter, a lesser included offense, and sentenced to twenty-one years imprisonment at hard labor.[8] On appeal, the reviewing court affirmed the defendant's conviction and sentence. State v. Harris, 99-1958 (La.App. 4 Cir. 11/15/00), 775 So.2d 718. In light of defense's theory that the shooting was accidental, we granted defendant's writ to more closely examine if defendant was prejudiced by the State's discovery violation. State v. Harris, 00-KK-3459 (La.11/9/01), 801 So.2d 363.

DISCUSSION
The defendant contends that the trial court erroneously allowed the State to present evidence of the defendant's intent to hurt the victim, viz-a-viz his statement to Weston prior to the shooting, without first giving the defense notice of its intent to use the statement as required by LA. CODE CRIM. PROC. ANN. ART. 716(B). During the police investigation immediately after the shooting, Weston gave a statement to Detective Pete Bowen in which Weston said the defendant told him he was going to hurt the victim. The statement in question was one the defendant made to Weston just before the shooting.[9]
The defendant learned of Weston's statement for the first time at the end of the opening day of trial. The disclosure came to light in an in-chambers conference to discuss another evidentiary issue which arose during the testimony of Dr. Defatta, the forensic pathologist who autopsied the victim's body. In addressing that evidence question, the State produced a supplemental *617 police report. When the defense examined the supplemental police report, they discovered Weston's statement that the defendant told him before the shooting that he (the defendant) said that he would hurt the victim. Although the trial court ordered the State to give the defense a copy of the supplemental report, it denied the defendant's motion for a mistrial. Later, during the State's direct examination, Weston stated that the defendant was upset on the night of the murder and that when the foursome arrived at the defendant's apartment, he (the defendant) was "upset from them fussing and stuff like that" and at that point he (the defendant) allegedly stated, "I'm going to hurt her; I'm going to hurt her."[10] Once again the defendant moved for a mistrial, which the trial court denied.
LA. CODE CRIM. PROC. ANN. art. 716(B) provides:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony to permit the defense to meet the State's case, and to allow proper assessment of the strength of its evidence in preparing a defense. State v. Statum, 390 So.2d 886, 889-90 (La.1980), cert. denied, 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 619 (1981). The failure of the State to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1281, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); State v. Schrader, 518 So.2d 1024, 1031-32 (La.1988). When the defendant is lulled into misapprehension of the strength of the State's case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which constitutes reversible error. State v. Mitchell, 412 So.2d 1042, 1044 (La.1982). Although a mistrial is among the sanctions which the trial court could have chosen if it had viewed the circumstances in this case as a discovery violation, a mistrial is a drastic remedy and, except in instances in which the mistrial is mandatory, is warranted only when a trial court error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. State v. Comeaux, 514 So.2d 84, 96 (La.1987). Moreover, as provided in LA.CODE CRIM. PROC. ANN. ART. 729.5, the article which details the arsenal of sanctions available for discovery violations,[11] no particular remedy is mandated.
*618 In the present case, the defense asked in question seven of its bill of particulars and motion for discovery and inspection:
Does the State intend to introduce any oral statements alleged to have been made by the defendant to a person(s) not associated with law enforcement agencies? If so, please give date, time, place, and officers and other persons present at the time of the oral statement and/or statements as provided by La. C.Cr.P. art. 716(B).
In its response, the State replied, "Unknown at this time. Will supplement when such information becomes available." No further information was forthcoming from the State prior to trial. Four months later, the defense filed a supplemental motion for discovery and inspection in which it asked whether the State intended to introduce at trial evidence of any statements of any kind allegedly made by the defendant.[12] The State did not file a response to this request.
The defendant primarily contends that he was prejudiced because the alleged statement that he made to Weston is the only evidence that suggests specific intent, a critical element of both the charged crime, second-degree murder, and manslaughter, the lesser included offense for which the jury convicted him, and undermined his contention that the shooting was accidental. The State counters by asserting that even if notice of the inculpatory statement on the first day of trial was untimely, the defendant cannot establish that he was prejudiced because it presented the jury with overwhelming evidence of the defendant's specific intent.
LA.REV.STAT. ANN. § 14:31(A) defines manslaughter as a homicide that would be murder under either LA.REV.STAT. ANN. § 14:30, first-degree murder, or LA. REV.STAT. ANN. § 14:30.1, second-degree murder, but specifies that the offense of manslaughter is "committed in sudden passion or heat of blood caused by provocation sufficient to deprive an average person of his self-control and cool reflection." As with first and second-degree murder, manslaughter requires proof of specific intent. State v. Humphrey, 412 So.2d 507 (La.1981).
LA.REV.STAT. ANN. § 14:10(1) defines specific intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Although intent is a question of fact in a criminal proceeding, the State need not prove it as a fact and it may be inferred from the circumstances. State v. Custard, 384 So.2d 428 (La.1980). When the State relies upon circumstantial evidence to prove specific intent, LA.REV.STAT. ANN. § 15:438 provides that the rule as to circumstantial evidence is: "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
Although we agree that the State erred in not timely informing the defendant of its knowledge of his statement to Weston, along with information as to when and where the statement was made, we find that the defendant has failed to demonstrate that this error prejudiced the presentation of his defense. First, the State presented other evidence which tended to prove the defendant's specific intent. All of the witnesses described a day-long argument between the defendant and the victim, an argument that began at the *619 home of defendant's mother and continued up to the victim's death. Even the defendant admitted that he and the victim were involved in a verbal argument about breaking up and that this argument began at the defendant's mother's home. As further evidence of this continuing argument, both Weston and O'Connor testified that the defendant struck the victim twice during the day. Moreover, the intensity of the argument was revealed to the jury when Weston poignantly testified that he twice yelled to the victim to leave the defendant's apartment, an indication that he feared for her safety.
In addition, Weston so feared for the victim that he struggled with the defendant to wrest control of the gun from him. Ultimately, however, Weston gave up the struggle and began to leave the apartment, another indication that he appreciated the tension of the moment. O'Connor further testified that the one time that the victim heeded Weston's warnings, the victim was so fearful that she hid in an abandoned building from the defendant. Finally, Weston described that when he saw the victim walking back to the apartment, the defendant had his hand around the victim's neckan indication that the defendant controlled the victim and wanted her back in his apartment.
More illustrative, however, of defendant's specific intent was the testimony that Weston and the defendant presented about the handgun. Initially, the record shows that it was the defendant who had the gun on his person during the course of the day, and it was he who retrieved the gun from his starter jacket. Weston further testified that just before the shooting he saw the defendant holding the gun to the victim's head. Although Dr. Defatta, the pathologist who autopsied the victim, could not determine whether the shooting was accidental, his testimony placed the gun within twelve inches of the victim's head. He also determined that the trajectory of the bullet was almost perpendicular to the cranium and that it moved predominately left to right through the cranium. When this evidence is viewed in conjunction with Weston's testimony that he observed the defendant hold the gun to the victim's head, a reasonable juror could certainly have inferred from these circumstances that the defendant had the requisite specific intent to kill the victim. Although the defendant said in his taped oral statement that he picked up the gun to scare the victim, we find that his action in aiming a gun at the victim just before the shooting is highly indicative of specific criminal intent. See State v. Meads, 98-1388 (La.App. 1 Cir. 4/1/99), 734 So.2d 792; State v. Donahue, 572 So.2d 255, 258 (La. App. 1 Cir.1990); State v. Holley, 528 So.2d 752, 755-56 (La.App. 1 Cir.1988), writ denied, 536 So.2d 1213 (La.1989). In the present case, certainly the defendant knew he held a deadly weapon as he pointed the gun at the victim in a deadly manner because his own statement to the police indicated that he wanted to scare her. Therefore, the defendant's actions and his own words indicated to the jury defendant's specific intent or, at least, an inference of his specific intent that the jury could logically make.
Lastly, with regard to the defendant's accident defense, we find that even without Weston's statement, a reasonable jury could have concluded that this defense was without merit. Just before the shooting, the defendant and Weston struggled over the gun, and as their struggle ended, Weston surrendered the gun to the defendant. Weston testified that in the ten seconds which lapsed between the time their struggle ended and the firing of the handgun, he heard complete silence in the apartment. After that silence was shattered with the sound of gunshot, Weston stated *620 that he turned and saw the weapon in the defendant's hand. This testimony directly negates the defendant's contention that he and the victim tussled over the gun and that the gun only discharged when the victim pushed him.
Moreover, our review of the record shows that the element of surprise, so often an aspect of the determination of prejudice, is greatly diminished in the case sub judice. Even though the State failed to provide the defendant with the information that the defendant had made a statement to Weston, the statement came from a witness that the defendant knew was with him throughout the day of the shooting and was with him both immediately before and after the shooting Accordingly, the defendant knew that Weston would form an integral part of the State's case against him. Furthermore, prejudice was further reduced because at the time that Weston testified at trial, the defendant not only had knowledge that a statement had been made, the primary information required by LA. CODE CRIM. PROC. ANN. art. 716(B), but he also had been advised of the content of that statement and had it available in his cross-examination of Weston.
In summation, we find that even without Weston's late-noticed statement, the evidence forms an ample basis for the jury verdict. Accordingly, we find that the defendant has failed to show that this discovery violation prejudiced him.

DECREE
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The evidence does not show the time that the foursome arrived at the defendant's apartment.
[2] The police never recovered the murder weapon. On cross-examination by defense counsel, Weston said that he could not be more accurate in his description because this was the first time he'd seen the weapon. A spent bullet of unknown caliber was recovered during the autopsy. However, when the police searched the defendant after his arrest, they found two live Winchester .38 caliber bullets in his pants pocket. Officer Thomatra Greene also testified that he recovered a live Winchester .38 caliber bullet in the hallway outside the defendant's apartment, a door or two from the crime scene.
[3] The only reference to the screwdriver, other than Weston's, is in a supplemental police report. In that report, Detective Terence Philips describes "a metal screwdriver with a yellow handle" that he found located on the bed next to the victim. No screwdriver was recovered at the scene and none of the photographs show a screwdriver.
[4] Photographs entered into evidence were identified by Detective Philips as showing several duffel bags in the bedroom of the apartment. He also stated that there was some clothes on the bed.
[5] A review of the defendant's oral taped confession, indicates several facts which vary from his trial testimony. Initially, there was no mention in his taped confession that the victim ever cocked and pointed the gun at him. On the other hand, the defendant failed to mention in his trial testimony that he got the gun from the couch and aimed it at the victim to scare her.
[6] The record reflects that the defendant's post-arrest statement to the police was so poorly recorded that the trial court chose to play it for the jurors in chambers and it was not transcribed for the record. See R. Tr., p. 150. In denying the defendant's objections to the introduction of the tape recording, the trial court stated that the recording was played in chambers because it was not audible in open court. The trial court also noted that the defendant and counsel were present when the recording was played.
[7] Dr. Defatta explained that when a gun is fired, gas, soot, and small unburned gunpowder flakes exit the muzzle with the bullet. As was the case with this victim, the muzzle was so close to the victim that soot and gunpowder flakes impregnated the victim's skin.
[8] The State subsequently charged the defendant as a second felony offender. After the defendant pleaded guilty as an habitual offender, the court set aside defendant's earlier sentence and imposed a sentence of 21 years in the custody of the Department of Corrections under LA REV. STAT. ANN. § 15:529.1. As provided in LA REV. STAT. ANN. § 15:529.1(G), "[a]ny sentence imposed under the provisions of this Section shall be without benefit of probation or suspension of sentence."
[9] Although the defendant also suggests that LA.CODE CRIM. PROC. ANN. ART. 768 dictated exclusion of the statement because the State did not provide timely notice of it before opening argument, the defense reluctantly concedes that art. 768 applies only to inculpatory statements of the defendant, i.e., statements made after, not before, the commission of the crime. See State v. Lewis, 416 So.2d 921, 924 (La.1982) ("For purposes of this article, the term `inculpatory statements' refers to defendant's out of court admission made after a crime has taken place which implicates defendant in its commission.... Because the defendant made the challenged statement one hour before the crime took place, Article 768 does not govern its admission into evidence.") (citations omitted).
[10] Arguably, Weston's statement was not specifically elicited by the State. A review of the transcript shows that the State simply asked him "When you got there [at the apartment], what happened?" Accordingly, it may be that Weston's testimony first chronicled the chronology of events as they arrived and his recitation of what the defendant said was simply not responsive to the question posed to him. Nonetheless, our characterization does not obviate our need to address the defendant's contention.
[11] As pertinent herein, LA.CODE CRIM. PROC. ANN. ART. 729.5 provides, "[T]he court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate."
[12] Although the transcript made available to us does not include the opening statements, the State asserted in brief and in oral argument that it made no reference to the defendant's statement to Weston in its opening statement to the jury.