826 So.2d 598 (2002)
STATE of Louisiana
v.
Derrick COLLINS.
No. 2001-KA-1459.
Court of Appeal of Louisiana, Fourth Circuit.
August 21, 2002.
*602 Harry F. Connick, District Attorney of Orleans Parish, Julie C. Tizzard, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellee.
Robert Grant, Tulane Law School, Community Service Program, Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE).
PATRICIA RIVET MURRAY, Judge.
In March 2000, defendant, Derrick Collins, was charged by bill of information with two counts of attempted first degree murder. At arraignment, he pled not guilty. In August 2000, following a hearing, the trial court found probable cause to arrest and denied Mr. Collins' motion to suppress identifications. In March 2001, a two-day jury trial was held, and the jury found him guilty of attempted second degree murder of one victim, Stanley Caine, and attempted manslaughter of the other victim, Terrence Harrison.
In April 2001, Mr. Collins filed a motion for post-verdict judgment of acquittal, which was denied by judgment issued in May 2001. In June 2001, the trial court sentenced Mr. Collins to ten years at hard labor without benefit of probation, parole, or suspension of sentence on both counts with the sentences to run concurrently. Subsequently, following a hearing on the state's multiple bill as to Mr. Collins' attempted second degree murder conviction, the trial court found him to be a second felony offender. The trial court thus vacated the original sentence and re-sentenced him to twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. The trial court granted Mr. Collins' motion for appeal.

FACTS
The crimes at issue occurred outside a nightclub called Pee Wee's Playhouse, which was located on Esplanade Avenue near the intersection of Claiborne Avenue in the City of New Orleans. Pee Wee's was owned by Jacqueline Gould. Stanley Caine, one of the victims, owned a neighboring nightclub. Ms. Gould described Mr. Caine as her business partner.
On the night of January 8, 1999, Ms. Gould testified that she was having a *603 birthday party at her nightclub. At some point, she realized that she was running short on change and thus went next door to Mr. Caine's club to get some change. When she arrived, Marie Burton, who worked at Mr. Caine's club as a barmaid, was sitting at the bar.[1] After Mr. Caine gave her some quarters, Ms. Gould invited him to come to the party. Although he replied that he would be there, he sent Ms. Burton ahead of him to the party; he arrived about thirty minutes later.
Ms. Gould described the atmosphere at her club that night as "really busy, hectic." At some point, an altercation broke out between Mr. Caine and Ms. Burton. Ms. Burton grabbed Mr. Caine's glasses and sprayed pepper (mace) spray into his eyes. Mr. Caine cleaned his face with water and went outside. Meanwhile, Ms. Gould escorted Ms. Burton into the ladies' bathroom. According to Ms. Burton, they were in the ladies' room for about five to ten minutes. During their conversation, Ms. Burton told Ms. Gould that the reason she was mad at Mr. Caine was because he owed her some money. After exiting the ladies' room, Ms. Burton went outside. A second incident occurred between Ms. Burton and Mr. Caine, which attracted a large crowd. Soon thereafter, Mr. Caine and Ms. Burton were separated. Mr. Collins then emerged from out of the crowd and shot both Mr. Caine and Terrence Harrison.[2]
Mr. Harrison was shot twice, once in his left forearm and once in his left hip. After being shot, Mr. Harrison ran across the street and around the corner to his sister's house where he collapsed and called for help. After the first shot, Mr. Caine collapsed on the street. According to witnesses, Mr. Collins then stood over Mr. Caine and fired several more shots.
One witness interviewed at the scene was Karen Lewis. Ms. Lewis was in her car at the intersection of Claiborne Avenue and Esplanade Street when she observed the shooting. She testified that she saw sparks leaving the weapon as the gunman fired at a male victim who was on the ground. She further testified that she saw the victim squirm as he was struck by the gunfire. Ms. Lewis then began to back up and saw the gunman running in her direction. Ms. Lewis stated that the gunman was with another man and that they were running towards an older model white car. After she gave a statement to the police on the scene, Ms. Lewis testified that the police took her to view two suspects in New Orleans East, but she was unable to identify either suspect.
A second witness interviewed at the scene was Michelle Deshotel. Ms. Deshotel testified that she too witnessed the shooting from her car. Ms. Deshotel testified that she had stopped at the red light when she heard a commotion and saw a large crowd of people. She saw two men and one woman going towards a man who was shooting. Ms. Deshotel testified that when the first victim was shot, he fell to the ground and when he started to get up the gunman shot him again. She further testified that the second victim went to get the gun out of the gunman's hands. She stated that she believed he was unable to do so, and thus ran; the gunman then shot him, and he fell. She still further testified that the gunman shot the second victim two more times from point blank range as he lay on the ground. Ms. Deshotel testified that after she gave a brief statement to police on the scene, the police took her *604 to view two suspects in New Orleans East. She too was unable to identify either suspect.
A third witness interviewed at the scene was Wilbert Craig. Mr. Craig testified that he was a patron at Pee Wee's that night and that he observed an oral altercation between Mr. Caine and Ms. Burton. After hearing gunshots, Mr. Craig testified that he went outside and saw Ms. Gould standing over Mr. Caine and that she was calling out to Mr. Craig for help. Mr. Craig further stated that he noticed Mr. Collins and a group of other people leaving the area and that he saw them jump into a car and depart.
Officer Wilfred Eddington testified that he arrived at the scene shortly after the shooting and immediately called an ambulance. He learned that one of the two victims had fled on foot, but collapsed at another location. He therefore directed some units to that other location. Officer Eddington then interviewed about five witnesses at the scene.[3] Three of the witnesses were women who were in their vehicles and happened to be at the intersection and observe the shooting; Officer Eddington described these witnesses as very upset, almost hysterical. The fourth witness was a bar room patron, Mr. Craig. The fifth witness, who several other witnesses mentioned Officer Eddington needed to speak to, was Ms. Gould, the bar room owner. According to Officer Eddington, when he interviewed Ms. Gould approximately twenty to thirty minutes after the shooting, she told him that the gunman was her son-in-law, Mr. Collins.[4] Officer Eddington described Ms. Gould as very distraught.
Officer Eddington then turned the investigation over to Detective Pete Bowen. Detective Bowen testified that upon being notified, he went to Charity Hospital, but was unable to speak to either victim. Detective Bowen requested that Ms. Gould be taken to the First District police station. According to Detective Bowen, Ms. Gould informed him at the station that Mr. Collins pulled a gun from his waistband and fired at Mr. Caine and Mr. Harrison. Ms. Gould told him that both victims started to run, but Mr. Caine collapsed. Ms. Gould further stated that Mr. Collins stood over Mr. Caine and fired several more shots. At that point, Detective Bowen told Ms. Gould that he needed to get a more formal statement and asked her to give a tape-recorded statement; she responded that she could not do that to her son-in-law. At that point, Ms. Gould stated that she wanted to leave, walked out of the detective's office, and left the station.
At trial, the state called Ms. Gould as a witness. When asked at trial about her refusal to give a tape-recorded statement, Ms. Gould responded that she asked the detective to use the ladies' room and then left the station because she was upset. Although she acknowledged talking to Detective Bowen about the shooting, she denied ever identifying Mr. Collins as the gunman. Significantly, however, she testified that she became aware of neighborhood gossip that she supposedly had told the police that Mr. Collins was the gunman *605 and that as a result she "was put in a very uncomfortable position."
Given Ms. Gould's denial of her prior identification, the state recalled Detective Bowen, who then testified that Ms. Gould told him the following:
She told me there had been a fight at the bar. The fight escalated outside. And during the fight, or while it was going on her son-in-law, she told me his name was Derrick Collins, pulled a gun from his waistband, fired at Terrence and Stanley. Terrence and Stanley started to run and Stanley collapsed. He must have been shot at this point. He collapsed in the intersection of Claiborne and Esplande.
She said Derrick stood over him, ran, chased him down, stood over him and fired several more shots. She told me she had no idea why Derrick would do that. And she was pretty upset about the thing being, one, that Stanley was shot because she knew him, and secondly because her son-in-law did it.
For the same reason, the state also recalled Officer Eddington who testified that about twenty to thirty minutes after the shooting Ms. Gould directly identified Mr. Collins as the gunman who shot both victims. Officer Eddington further testified that he documented this in his police report. He still further testified that Ms. Gould was very upset and that she identified Mr. Collins as her son-in-law.
Again, to rebut Ms. Gould's testimony, the state recalled Ms. Lewis, who related an encounter she had on the night of the shooting with Ms. Gould; particularly, Ms. Lewis testified:
I never knew her name, but when everything happened ... we had to get into an Explorer and drive all over the city to try to identify the shooters. And when they brought us back I was like a nervous wreck. My legs were shaky. And this lady was sitting on the curb and I went over to her and I was like, God, I wish I could sit down next to you because I'm a nervous wreck. And she said, imagine how I feel; she said the guy that did the shooting is her son-in-law. And she said she would have to tell the story to the police that would put her own son-in-law away and that would involve her daughter, and a lot of stuff would happen in her family and whatever.
On re-cross examination, Ms. Lewis stated that she did not tell the police about this encounter on the night of the shooting because she "didn't want to tell anything additional to keep [her] there longer than [she] had to be there." She, however, testified that she did inform the police of this in a telephone conversation not more than two months nor less than two weeks before trial.
The state also called as a witness Dr. Joseph Barrios. Dr. Barrios testified that when Mr. Caine arrived at Charity Hospital he was in critical condition. Dr. Barrios testified that Mr. Caine had a nondetectable blood pressure and an extremely elevated heart rate. Dr. Barrios stated that Mr. Caine was shot both in the abdomen and in the right side or back. Mr. Harrison was also treated at Charity emergency room for his less severe injuries.
Both Mr. Caine and Mr. Harrison likewise testified for the state. Both victims confirmed their positive identifications of Mr. Collins from the photographic lineups that Detective Bowen showed to them. In that regard, Detective Bowen testified that he prepared photographic lineups of Mr. Collins and that on separate occasions he presented those lineups to both victims. On January 21, 2000, Mr. Harrison viewed two lineups. Although he was unable to *606 make an identification from the first lineup, Mr. Harrison identified Mr. Collins from the second lineup. On January 25, 2000, soon after being released from the hospital, Mr. Caine likewise was shown a photographic lineup, and positively identified Mr. Collins.
At trial, Mr. Collins testified on his own behalf and presented an alibi defense. Mr. Collins testified that he worked that night at his job as a cook. After he got home from work, Carl Winchester, a friend and co-employee, came by his house to pick him up to go to the party that night at Pee Wee's. Mr. Collins testified that he told Mr. Winchester that he was tired and that he would see him the next day. Mr. Collins testified that he had never met either victim and denied knowing Ms. Burton.
Mr. Collins' alibi defense was corroborated at trial by the testimony of Mr. Winchester, Jumal Otis, and Mirian Collins.
Mr. Winchester testified that on the night in question he and Ms. Otis, his fiance, went to Mr. Collins' house to pick him up to go to Ms. Gould's party. When they arrived, Mr. Winchester testified that Mr. Collins told them he was tired and his feet hurt and that he was in for the night. Mr. Winchester testified that he and Ms. Otis went to Pee Wee's and were present when the confrontation erupted, but they left soon thereafter. Asked whether he saw Mr. Collins at Pee Wee's that night, Mr. Winchester responded that he did not. Ms. Otis testified consistently with Mr. Winchester.
Miriam Collins, Mr. Collins' wife, testified that Mr. Collins came home from work that night at 12:40 a.m. and said that he was tired. She described his actions that night as follows: he ate, took a bath, and then went to sleep. She testified that the next time she saw him was in the morning. She stated that she was right next to him all night and that he did not go anywhere that night. Ms. Collins also testified that although she is not related to Ms. Gould, she and Ms. Gould had a mother-daughter relationship, and she calls her mother.
As stated, the jury convicted Mr. Collins of attempted second degree murder of Mr. Caine and attempted manslaughter of Mr. Harrison. This appeal followed.

ERRORS PATENT
A review of the record reveals one error patent. Mr. Collins' sentence for attempted manslaughter should not have been imposed without benefit of parole, probation, or suspension of sentence. See La. R.S. 14:31(B), 14:27(D)(3); State v. Green, 93-1432 (La.App. 4 Cir. 4/17/96), 673 So.2d 262. We thus amend the sentence to delete that improperly imposed prohibition.

DISCUSSION

Defective Bill of Information
Mr. Collins contends that the state failed to fully notify him of the nature of the offense charged. Particularly, he contends that the state used a short form indictment charging him with two counts of attempted first degree murder without specifying the aggravating element. Mr. Collins contends this violated his constitutional right to due process and to be advised of the nature and cause of the accusations against him. He argues that he had to guess at the aggravating element that formed the basis of the first degree murder charges.
The indictment in this case followed the short form provided for in La. C.Cr.P. art. 465(A)(31). The use of this short form is constitutionally valid. State v. Coldman, 99-2216 (La.App. 4 Cir. *607 8/30/00), 769 So.2d 131. To the extent Mr. Collins was unaware of the precise aggravating element subsection for which he was being charged, he had the right to secure by bill of particulars the essential facts of the charge against him, including the alleged method of commission of the offense. La.C.Cr.P. art. 484; State v. Russell, 292 So.2d 681 (La.1974); State v. Larsen, 489 So.2d 324 (La.App. 4th Cir. 1986). The record reflects that Mr. Collins' trial counsel filed a bill of particulars, yet failed to request the aggravating element be specified. Regardless, the record further reflects that trial counsel was adequately informed of the nature of the charged offense. Trial counsel was provided with police reports, and both a preliminary hearing and a motion to suppress identifications hearing were held.
Mr. Collins' only allegation of prejudice is that he was precluded from challenging the bill of information on the basis of double jeopardy. He further alleges a double jeopardy violation resulted by charging two counts of attempted first degree murder when the aggravating element is an intent to kill more than one person, and each count forms the basis for the aggravating element of the other count. In State v. Murray, XXXX-XXXX (La.9/19/2001), 799 So.2d 453, the Louisiana Supreme Court held that such a charging scheme does not violate double jeopardy. We thus find this assignment of error unpersuasive.

Sufficiency of the evidence
Mr. Collins' second assignment of error is that the evidence introduced at trial was insufficient to sustain the convictions. This assignment of error has three components: (1) insufficiency of identification, (2) insufficiency of evidence rebutting justification defense, and (3) insufficiency of evidence of specific intent to kill more than one person. All three components are governed by the same standard of review the due process standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Under the Jackson standard, "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). The Jackson standard "preserves the role of the jury as the factfinder in the case but it does not allow jurors `to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" State v. Pierre, 93-0893, p. 5 (La.2/3/94), 631 So.2d 427, 429. Nonetheless, credibility calls are within the fact-finder's discretion and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
Under the Jackson standard, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Jacobs, 504 So.2d 817, 820 (La.1987). When circumstantial evidence forms the basis for the conviction, the totality of such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.[5] However, the circumstantial evidence rule is not a separate test from the Jackson standard; La. R.S. 15:438 is simply "an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate *608 review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." State v. Wright, 445 So.2d 1198, 1201 (La.1984). Ultimately, the totality of the evidence must be sufficient to satisfy a rational trier of fact that the defendant is guilty beyond a reasonable doubt. State v. Sutton, 436 So.2d 471 (La.1983).
Applying these standards, we separately address each of Mr. Collins' alleged sufficiency of the evidence violations.

Identification
First, Mr. Collins contends the state failed to provide sufficient evidence of his identification as the gunman. When a defendant disputes identity, the state must negate any reasonable probability of misidentification. State v. Smith, 430 So.2d 31, 45 (La.1983). A five-factor test for testing the reliability of an identification was enunciated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); to wit; (1) the witness' opportunity to view the assailant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the assailant, (4) the witness' demonstrated level of certainty, and (5) the time lapse between the crime and the confrontation. See State v. McNeal, 99-1265 (La.App. 4 Cir. 6/14/00), 765 So.2d 1113, 1117, writ denied, 2000-2134 (La.9/28/01), 797 So.2d 684.
Mr. Caine testified that the shooting occurred while he was talking to Ms. Gould about why Ms. Burton had attacked him; particularly, he testified: "Next thing, you know I hear Jackie say, no, not Snake. And I turned around and this guy here just walked up to me, smiling, just shoot me for no reason. Then after that he just stood over me and just shot me two more times." Mr. Caine further testified that he had been introduced to Mr. Collins on a prior occasion, but he indicated that it was a simple introduction and that he had not conversed with him. Asked whether he recognized Mr. Collins when he walked up to him and pulled the gun, Mr. Caine replied: "Oh, yes." Continuing, he stated that he "just couldn't believe why he had done it." When Mr. Caine viewed the photographic lineup, he immediately recognized Mr. Collins, stating: "That's him right there."
Applying the five-factor test, Mr. Caine's identification was established to be reliable. Indeed, Mr. Collins' attack on Mr. Caine's identification was more a credibility, than a reliability, attack. Mr. Collins stressed that Mr. Caine stated that while Ms. Burton was at his club that night she was with an unknown male companion. Mr. Caine testified that during the time when he was recovering from his injuries he was plagued by the question of why anyone would want to shoot him. He recalled that Ms. Burton's companion shared some physical characteristics with Mr. Collins, yet he had not paid close enough attention to know if Mr. Collins was the same person who was with Ms. Burton at his club that night. Mr. Caine's wife reminded him that he had a surveillance tape from his club from that night, and he reviewed that tape hoping to determine if Mr. Collins was Ms. Burton's male companion that night and to discover if there was some explanation why Mr. Collins shot him. Mr. Caine, however, testified that the image on the tape was too blurry to draw a conclusion.
The gist of Mr. Collins' argument is that he was not Ms. Burton's male companion that night and that it was that unidentified male companion who was the actual gunman. Mr. Collins further argues that Mr. Caine's testimony that he had been introduced on a prior occasion to Mr. Collins was false. Mr. Collins contends that if he had been introduced to Mr. Caine before *609 the shooting, then Mr. Caine would have been able to determine whether he was that male companion. At trial, defense counsel failed to cross-examine Ms. Burton regarding either her male companion's identity or her prior introduction of Mr. Caine to Mr. Collins.
Credibility calls are for the fact-finder. This court thus declines to question the jury's decision regarding the weight and credibility to give Mr. Caine's identification testimony. Vessell, 450 So.2d at 943.
Similarly, Mr. Collins' attack on Mr. Harrison's identification is a credibility, as opposed to a reliability, attack. Mr. Collins argues that because Mr. Harrison did not inform the police of Mr. Collins' identity on the night of the shooting he lacks credibility. We disagree. Mr. Harrison testified that he "looked [the gunman] dead in the face" and that he was positive that Mr. Collins was the gunman. Mr. Harrison further testified that he had been introduced to Mr. Collins on a prior occasion at Pee Wee's by Ms. Gould, who referred to him as her son-in-law. Mr. Harrison stated that there was nothing that prevented him from seeing Mr. Collins. He further testified that when he viewed the photographic lineup, he looked over the subjects and said "that's him right there."
The reliability of Mr. Harrison's identification is bolstered by Detective Bowen's testimony. At trial, Detective Bowen read from a report that he prepared the portion that reflected Mr. Harrison, while at the hospital, informed Detective Bowen's partner, Detective Ricky Hunter, that the gunman was the bar owner's relative. To the extent the jury gave weight to Mr Harrison's testimony it was not clearly contrary to the evidence. Again, this was a credibility call for the fact-finder that we decline to disturb. See Vessell, supra.

Justification
Mr. Collins contends that the gunman was justified in shooting Mr. Caine because it was necessary to save Ms. Burton's life. In support of this justification defense, Mr. Collins cites La. R.S. 14:19 and 14:22.[6] Under these provisions, the justification defense requires that the force used be reasonable under the circumstances and necessary to prevent an imminent assault. State v. Landry, 381 So.2d 462 (La.1980). Neither of these requirements are satisfied in this case.
Ms. Gould testified that after she spoke with Ms. Burton in the restroom, she escorted her outside. At that point, Mr. Caine was standing on the driver's side of a gray van parked outside and talking to someone. Ms. Burton then walked to the passenger side of the van and said something to Mr. Caine. At that point, he came around the front of the van, and they resumed their fight. Ms. Gould stated that a fist-fight ensued between them, and they began hitting each other. According to Ms. Gould, Ms. Burton, who was a small woman, was holding her own. At that point, Ms. Gould stated that she *610 jumped in to break up the fight and grabbed Mr. Caine. Contemporaneously, other people began grabbing Ms. Burton. Ms. Gould stated that she slipped and fell and that Mr. Caine fell on top of her. Then, Ms. Gould grabbed Mr. Caine's pant leg to keep him from getting away, but he got loose. At that point a large crowd had gathered and was surrounding Mr. Caine. Ms. Gould then began screaming and attempting to explain the situation.
According to Ms. Burton, when she came outside she saw Mr. Caine talking to her husband by the van. She stated that she called out something to Mr. Caine and that he came around the van and began beating her up again and eventually knocked her out. She stated that was all she remembered.
Mr. Harrison testified that while he was outside with Mr. Caine and Ms. Burton, he saw Ms. Gould come out of her bar and saw Ms. Burton attempt to spray pepper (mace) at Mr. Caine again. He further testified that Mr. Caine grabbed Ms. Burton and shoved her out the way, causing her to fall to the ground. He still further testified that a crowd of people started exiting the bar and heading in their direction. Mr. Harrison stated that Mr. Caine was telling them: "Come on, let's go, don't worry about it let's just go." At that point, Mr. Harrison stated that Mr. Collins came through the crowd "talking about, `watch out, watch out' and shoots me and then he shoots Mr. Caine."
Mr. Caine's testimony was that when he went outside the bar to wipe his eyes, Ms. Burton came up to him and tried to mace him again. Mr. Caine stated that she tried to run, but he grabbed her hair, and held onto her hair until she pulled it loose.[7]
Despite this conflicting testimony concerning the circumstances surrounding the fight, the testimony established that the fight between Ms. Burton and Mr. Caine had ended at the time of the shooting. Shooting Mr. Caine at that point was thus neither necessary, nor reasonable. The requirements for asserting the justification defensethat the force used be reasonable under the circumstances and necessary to prevent an imminent assaultwere not met. See Landry, supra. Regardless, given the nature of the fight, the level of violence employed was not justified.

Specific intent to kill more than one person
Mr. Collins contends that the evidence was insufficient to established he possessed the specific intent to kill more than one person with respect to both counts of the indictment. Given that Mr. Collins was not convicted of attempted first degree murder, the only relevant elements are those of attempted manslaughter. To support a conviction of attempted manslaughter, the state must prove the defendant specifically intended to kill and committed an overt act toward that goal. State v. Whins, 96-0699 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350.
Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow from his acts or omissions. La. R.S. 14:10(1). Specific intent is a mental state that can be inferred from the circumstances of the transactions and the defendant's actions (or inactions). Specific intent to kill has been found to exist when the defendant fired a gun at the victim. State v. Davis, 93-0663 (La.App. 4 Cir. *611 2/25/94), 633 So.2d 822. Here, Mr. Collins' act of shooting the victim at close range clearly was sufficient to support the conviction for attempted manslaughter.

Brady Violation
Mr. Collins contends that the state withheld material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A finding of materiality under Bagley necessarily precludes a finding of harmless error. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Thus, the Supreme Court has explained that a true Brady violation has three components; namely: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).
Mr. Collins contends that the fact that the police took Ms. Lewis and Ms. Deshotel to view two suspects in New Orleans East on the night of the shooting was exculpatory evidence withheld by the prosecution. Mr. Collins further alleges that the fact Mr. Harrison viewed two separate photographic lineups also constituted a Brady violation. Mr. Collins contends that Mr. Harrison viewed a photographic lineup of a second suspect.
Mr. Collins argues that the two unreported identification procedures constitute Brady violations because "[t]his information would have been key to the defense showing that 1) the police did not develop Derrick Collins as a suspect immediately, but that the whole conclusion was based on neighborhood gossip, or that 2) the police themselves did not think the allegations against Collins were reliable." Although Mr. Collins apparently was not informed of these two identification procedures before trial, the information was brought out at trial.
Addressing the first alleged infraction, i.e., the New Orleans East trip (a "show up lineup on the night of the shooting"), we first note that for Mr. Collins to prevail he must establish that the withheld evidence was exculpatory. That the police stopped a white vehicle whose occupants were not identified is not, in and of itself, favorable evidence for the defense. Mr. Collins, nonetheless, contends that this is favorable evidence because it demonstrates that the police did not immediately develop him as a suspect.
Detective Eddington testified that he spoke to Ms. Gould twenty to thirty minutes after arriving on the scene. The record does not reflect the exact time that the witnesses were taken to view the suspects in New Orleans East. Regarding the length of time following the shootings that she initially spoke to the police, Ms. Deshotel stated: "It was awhile. It wasn't immediately." To the extent this evidence demonstrated that the police did not immediately regard Mr. Collins as a suspect, defense counsel could have made this point at trial, yet defense counsel opted not to question either of the police officers on this topic. Regardless, Mr. Collins was able to suggest to the jury any inference that was plausible from the attempted identification.
Turning to the second alleged infraction, i.e., the additional photographic lineup *612 that was shown to Mr. Harrison, the record does not reflect the circumstances surrounding that second lineup. Despite Mr. Collins' protestations on appeal regarding the significance of this information, even after this information was brought out at trial, the defense did not seek to recall Detective Bowen to inquire into the apparent existence of a second suspect. Defense counsel simply never addressed the issue. In any event, that Mr. Harrison viewed another lineup and failed to identify anyone does not, on its face, suggest Mr. Collins' innocence.
This assignment of error is unpersuasive.

Cousin ViolationPrior Identification
During the state's direct examination of Ms. Gould, she denied that she told either Officer Eddington or Detective Bowen that Mr. Collins was the gunman, yet admitted that she told Detective Bowen that she knew Mr. Collins and that she referred to him as her son-in-law. In response, as noted earlier, the state recalled Detective Bowen and Officer Eddington, both of whom testified that Ms. Gould had informed them that Mr. Collins was the gunman. Again, as noted earlier, the state also recalled Ms. Lewis, who testified that after they returned from New Orleans East that night a woman sat next to her and told her that "the guy that did the shooting was her son-in-law" and that the woman was "like in a catch-twenty-two-situation."
Mr. Collins contends that the manner in which the state presented this evidence was strikingly similar to the manner in which the state presented its case in State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065. In Cousin, supra, the state attempted to elicit testimony from the defendant's friend that the defendant had admitted his involvement in a robbery and murder. At trial, the friend denied that the defendant made any such statement to him, yet admitted telling police that the defendant had made that statement. As to the latter admission, the friend testified that "he had only told police [at a meeting]... what his lawyer and the police told him to say in order to receive favorable treatment on pending charges." Cousin, 96-2973, p. 5, 710 So.2d at 1068.. Supposedly for impeachment purposes, the state then called as witnesses the friend's lawyer who represented him on the pending charges, the police detective who was present at the meeting, and the friend's sister. As a result of those three witnesses' testimony, the contents of the friend's hearsay statement that the defendant had admitted to him his involvement in the robbery and murder were brought out to the jury. Furthermore, "in closing argument, the prosecutor, over objection, improperly urged the jury to accept the substance of the hearsay statements and to use the statements to convict defendant." Cousin, 96-2973, p. 16, 710 So.2d at 1073. Finding the prosecutor's improper use of the friend's hearsay statement was not harmless error, the Supreme Court reversed the first degree murder conviction and remanded for a new trial.
Mr. Collins argues that the prosecutor's trial strategy in this case tracks that improperly used in Cousin and likewise dictates a reversal of his conviction. We disagree. Although as in Cousin Ms. Gould's prior inconsistent statements were introduced by the testimony of three witnesses (the two officers and Ms. Lewis) and although the prosecutor used this testimony in closing arguments,[8] that factual *613 similarity is overridden by the legal difference in the nature of Ms. Gould's prior statements. In Cousin, the prior statements were inadmissible hearsay because the statements purportedly made by the defendant to his friend did not fall within the narrow exception provided in La. C.E. art. 801(D)(1)(a) for prior inconsistent statements "given under oath." In contrast, Ms. Gould's prior statements are not hearsay because her statements fall within the exception provided by La. C.E. art. 801(D)(1)(c) for prior identifications. This distinction renders Cousin inapposite.
This distinction between the prior statements at issue in this case as opposed to those in Cousin arises as a result of the "quite different criteria controlling when these statements [by a witness (prior inconsistent statements and prior identifications) ] fall outside the hearsay rule." Graham C. Lilly, An Introduction to the Law of Evidence § 53 (1978). As noted, in Cousin, the prior inconsistent statement was hearsay because it was not made under oath. In contrast, "[a] prior identification is considered outside the hearsay rule if no more is shown than that the testifying witness, now subject to cross-examination, made an earlier identification of the person in question `after perceiving him.'" Lilly, supra.
As noted, La. C.E. art. 801(D)(1)(c), which conforms with its federal counterpart, is the pertinent evidentiary rule that governs prior identification statements; this rule provides that a witness' prior statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and the statement is "[o]ne of identification of a person made after perceiving the person." La. C.E. art. 801(D)(1)(c). Although another circuit has narrowly construed this rule as applying solely to statements made in the context of an identification procedure,[9] the rule has been applied to prior statements of identification "made in a wide range of circumstances." 29 Am. Jur.2d Evidence § 678; George W. Pugh, et al., Handbook on Louisiana Evidence Law 519 (2002 ed.)(noting authors' tendency to agree with broader construction adopted by federal courts and citing as illustrative U.S. v. Brink, 39 F.3d 419 (3d Cir.1994)). In State v. Johnson, 99-3462 (La.11/3/00), 774 So.2d 79, the Supreme Court quotes the Brink case with approval, stating: "`If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by testimony of a person to whom the statement was made, and the statement can be given substantive effect.'" Johnson, 99-3462 at pp. 2-3, 774 So.2d at 80 (quoting Brink, supra). We adopt that broader construction of the rule.
In Johnson, supra, the Supreme Court further notes that La. C.E. art. 801(D)(1)(c)'s rule regarding prior identifications is an exception to the general rule discussed in Cousin that a witness' prior *614 inconsistent statements is not admissible as substantive evidence; specifically, the Court states:
When a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt.... Cousin, 96-2673 at pp. 8-9, 710 So.2d at 1069. An exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c), Louisiana's counterpart of Fed. R.Evid. 801(d)(1)(C).
Johnson, 99-3462 at p. 2, 774 So.2d at 80. Such statements of identification are, by statute, defined as non-hearsay.
Illustrating what constitutes a statement of identification, a commentator states:
When A testifies that on a prior occasion B pointed to the accused and said, "That's the man who robbed me," the testimony is clearly hearsay. If, however, B is present in court, testifies on the subject of identity, and is available for cross-examination, a case within the present section is presented.
2 John William Strong, McCormick on Evidence § 251 (4th ed.1992). Obeying the traditional hearsay formula such prior identifications would be hearsay; "[a] pretrial assertion ... that identifies the accused as the person who committed the act charged normally is offered for its truth and thus is hearsay." Lilly, supra at § 52.
In excluding statements of identification from the hearsay rule, Congress cited two perceived problems it was attempting to remedy; to wit:
(1) the typical situation where the witness's memory no longer permits a current identification and he therefore can only testify as to his previous identification; and
(2) the instance where before trial the witness identifies the defendant and then because of fear refuses to acknowledge his previous identification.
3 Michael H. Graham, Handbook of Federal Evidence § 801.13 (5th ed.2001)(quoting U.S. v. Milton, 8 F.3d 39, 47 (D.C.Cir.1993)(quoting 121 Cong. Rec. 31, 866-67 (Congressman Hungate and Wiggins)).
In the second situation, "`the witness's prior identification can only be introduced into evidence by a third party who was present at the original identification.'" Graham, supra. The rule thus contemplates that the declarant will not remember or deny making a prior statement, and "testimony of any person who was present, for example a police officer, is also admissible." Graham, supra. As the court noted in Brink, "`If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect.'" 39 F.3d at 426 (quoting Jack B. Weinstein and Margaret Berger, Weinstein's Evidence ¶ 801(d)(1)(C)[01], at 801-222 (1993)).
The second situation was presented in this case, as evidenced by Ms. Gould's own testimony that in the interim between the shooting and trial she became aware of neighborhood gossip that she supposedly had told the police that Mr. Collins was the gunman and that as a result she "was put in a very uncomfortable position." The testimony of Detective Bowen, Officer Eddington, and Ms. Lewis fall within the exception for statements of identification set forth in La. C.E. art. 801(D)(1)(c). *615 Hence, Ms. Gould's prior statements of identification were not hearsay and were properly admitted through those three witnesses as substantive evidence.

Discovery Violation
Mr. Collins contends that the state committed a discovery violation by failing to disclose Ms. Lewis'"surprise" statementi.e., that Ms. Gould had told her that her son-in-law was responsible for the shootingand that as a result the defense was misled as to the strength of the state's case. Recently, in State v. Harris, XXXX-XXXX, pp. 8-9 (La.2/26/02), 812 So.2d 612, 617, the Supreme Court addressed the topic of discovery violations, stating that the state's failure to comply with discovery rules does not result in an automatic reversal; rather, prejudice must be shown. Id. (citing State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1281. "When the defendant is lulled into misapprehension of the strength of the State's case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which constitutes reversible error." Id. (citing State v. Mitchell, 412 So.2d 1042, 1044 (La.1982)).
In the present case, Mr. Collins raised this issue in a post-trial motion before the trial court. Rejecting this argument regarding Ms. Lewis' alleged "surprise" testimony, the trial court reasoned that "La.C.Cr.P. art. 723 does not require general disclosure of state witness statements. Defense counsel's argument that they were precluded from questioning the police as to Karen Lewis' demeanor is of no moment, since, again, nothing precluded the defense from recalling the police or any other witness in the defense case." We agree.
As the trial court noted, the applicable provisions of the Code of Criminal Procedure do not provide for general discovery of state witnesses' statements, and Mr. Collins fails to articulate any theory under which Ms. Gould's statement to Ms. Lewis was discoverable. Furthermore, Mr. Collins was aware of Ms. Gould's statements to Detective Bowen and Officer Eddington, and Ms. Gould's statement to Ms. Lewis was thus cumulative.

La. R.S. 15:529.1(C) violation
Mr. Collins' final argument is that his multiple offender conviction should be vacated because the state failed to prove that the requisite ten-year period under La. R.S. 15:529.1(C) had not elapsed.[10] La. R.S. 15:529.1(C) provides:
This Section shall not be applicable in cases where more than ten years have elapsed since the expiration of the maximum sentence or sentences of the previous conviction or convictions, or adjudication or adjudications of delinquency, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any of said ten-year periods.
The date of actual discharge from supervision from the Department of Corrections determines the expiration of the previous sentence. State v. Lorio, 94-2591, p. 4 (La.App. 4 Cir. 9/28/95), 662 So.2d 128, 130. Although the state generally has the burden of proving that this ten-year period has not expired, the state need not prove discharge dates when less *616 than ten years have elapsed between convictions. State v. Tucker, 95-0030, p. 11 (La.App. 4 Cir. 9/18/96), 682 So.2d 261, 266.
Applying these principles to the instant case, Mr. Collins committed the instant offense on January 8, 2000. Mr. Collins' previous conviction (possession of cocaine) was committed on February 12, 1990, and he pled guilty to that offense on August 28, 1990. On the face of the record, less than ten years have elapsed between the two convictions. We thus find this assignment of error unconvincing.

DECREE
For the foregoing reasons, we affirm the conviction; amend the sentence to delete the prohibition that it be served without benefit of parole, probation, or suspension of sentence; and, in all other respects, affirm the sentence.
AFFIRMED AS AMENDED.
NOTES
[1] At trial, it was established that Ms. Burton has multiple prostitution convictions.
[2] Although Mr. Harrison was Mr. Caine's friend, the testimony at trial indicated that Mr. Caine regarded Mr. Harrison as his son.
[3] The witnesses provided two different age groups for the gunman: eighteen to twenty-two and twenty-nine to thirty years old. According to Officer Eddington, the height of the gunman was unknown. The witnesses estimated the gunman's weight to be between 200 and 250 pounds.
[4] Although Ms. Gould repeatedly referred to Mr. Collins as her son-in-law, the record reflects that he was not actually her relative. Rather, Ms. Gould was so close to Mr. Collins' wife that she regarded her as a daughter and him as a son-in-law.
[5] That statute provides the circumstantial evidence rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.
[6] La. R.S. 14:19 provides:

The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
La. R.S. 14:22 provides:
It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
[7] As to this point, Ms. Burton stated in her testimony that she was wearing hair extensions that night, but she claimed that Mr. Caine pulled them loose earlier during the struggle inside the bar.
[8] In closing argument, the prosecutor stated: And then Jackie Gould. You've got to throw her in there on top of this. These are kind of like a sandwich. And you put Jackie Gould in the middle. This one identifies; this one identifies; and you've got Jackie Gould in the middle who says he did it, but now I'm thinking better of it. And then kind of like a little lettuce and tomato with that is going to be Karen Lewis and Detective Bowen and Eddington who said they told me too. You've got a guilty sandwich right there. That's what it is.
[9] See State v. Hester, 99-426, pp. 18-19 (La. App. 5 Cir. 9/28/99), 746 So.2d 95, 108, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342 (holding this provision not applicable because witness gave the descriptions to the detective "before she made the photographic identifications and had nothing to do with an identification procedure."
[10] Although Mr. Collins refers to this ten-year period as a "cleansing period," we note the Supreme Court's recent admonition that courts avoid using that terminology. State v. Everett, 2000-2998 (La.5/14/02), 816 So.2d 1272.